THE MUSKEGON BOOMING COMPANY v. ALFRED E. UNDER-HILL ET AL.

*Delivery of logs—Stoppage in transitu.*

A contract for logs provided that the vendor should drive them to the main stream to be taken in charge by a booming company when its drive went down, and if too late should follow and overtake the drive. The vendor engaged another person who was taking a large quantity of other logs to meet the drive to take these logs with them, but he missed the drive, and as he could not separate the logs and had engaged to take the other logs farther, he took these also, the vendor apparently acquiescing. When he reached his destination the main drive had not been overtaken, and as he was going no farther, the purchaser, without objection from the vendor, engaged the booming company to go back and collect the logs and run them to a designated place. *Held* that the course of the parties to the contract of sale amounted to a delivery which cut off any lien the vendor might have had on the logs, and his right to stop them in transit.

Error to Muskegon. Submitted April 23. Decided June 11.

TROVER for the conversion of a quantity of logs by disregarding the vendor's notice to retain them and by delivering them to the purchaser. Defendant brings error.

*Smith, Nims, Hoyt & Erwin* for plaintiff in error.

*Stevenson & McLaughlin* for defendant in error.

GRAVES, J. The present defendants in error brought this cause before us at the April term a year ago, and we sent it back for a new trial. 40 Mich. 660. At the trial so ordered they recovered, and the booming company now asks a reversal for alleged errors thereat. It is unnecessary to follow the able and extended range of counsel. The controversy, when examined closely, appears to be subject to decision on comparatively narrow ground. The final result is fairly dependent on the effect of the transaction at Big Rapids. But for the purpose of ascertaining that effect it is essential to keep in mind and apply the antecedent and surrounding circumstances. They were invariably contemplated by the parties, and were regarded as belonging to the arrangements. In all the various proceedings there was a tacit reference, if not an express one, to the surrounding conditions and established methods of lumbering along the Muskegon and its branches, and no one can form an intelligent idea of the transactions by viewing them as abstractions and apart from their practical relations.

The written contract between Eldred & Co. and the Underhills covering the sale of the logs in question is given in the former report of the case and need not be repeated here. In making it the parties had direct reference to the fact that the booming company was engaged in the general business of driving, assorting and delivering logs in the main river, and received from log owners each season a kind of agreement, together with an account of the logs they desired the company to take in charge, and that the company made up what is called a main drive, consisting of the various lots in readiness at the mouths of tributaries or elsewhere in the main stream, and the respective lots agreed for being taken in charge in the progress of the drive down the river.

For the purpose of the view now taken the case is to be considered on the state of facts advanced or admitted on the part of defendants in error. The land belonged to them, and the logs were to be put afloat in

the west branch of the Muskegon, in Missaukee county, some few miles above the mouth, the latter point being from fifty to sixty miles above Big Rapids on the main river.   They were all put in about the first of March and marked with the registered mark of Eldred & Co., and in April Eldred & Co., acting as owners, reported to the booming company their ownership and the situation and description of the logs, and agreed with it to take charge at their expense and drive and deliver the logs to such places as they should direct, the drive to be extra from Big Rapids.   It is admitted that the booming company had no contract or dealings with defendants in error.

  ' According to the contract between the sellers and buyers, Eldred & Co. and the Underhills, the ownership vested in the buyers as soon at least as the logs were put afloat; but the sellers retained the possession with the obligation to deliver it to the buyers in the main river in time for the main drive by the booming company, subject however to this, that if the passage out to the main river should turn out to be too late for that drive, then the sellers, at their own expense, should go down and make delivery of possession where the main drive should be overtaken.   These provisions for delivery of possession in the main river and at the drive were in the exclusive interest of the buyers.   They imposed burdens on the sellers, but conferred no advantage, and the buyers were not bound to insist on them.   Being for the exclusive benefit of Eldred & Co., it was competent for Eldred & Co. to waive them.   The end to be gained was to get the logs into the hands of the booming company for Eldred & Co., to be held and handled as their property and according to their orders.

  The presence of the main drive was not adverted to as of any importance in itself in connection with the intended shift of possession.   It was thought of in that relation because no other condition suggested itself as likely to favor or accommodate the end.   The essence

of the contract for passing the possession was as just stated, and if fully and fairly accomplished the absence of an aid originally supposed to be necessary ought not to have any influence. In the early spring Watson was getting ready to drive for four others down the west branch to the main river, and about the first of April the Underhills contracted with him orally to take the logs in controversy. There were of these a little over 135,000 feet, whilst the other logs composing his drive contained more than 30,000,000. The terms of the contract they made with him were brief. They were simply that he should drive the logs out of the branch for fifty cents a thousand.

A junction with the spring drive of the booming company at the mouth of the branch was contemplated, and that the company would there receive these logs in the interest and on account of Eldred & Co., and proceed with them down the river. It held the before-mentioned contract with Eldred & Co., and the logs bore their consignment mark as made upon them by Underhills. Watson proceeded down the branch and reached the mouth on the second day of August, and then found that the drive of the booming company, which was expected to take his, had passed there about the first of July. The other parties for whom he had been driving were anxious to have their logs go forward that season, and were of opinion that the booming company drive, which had passed down, might be overtaken at Big Rapids, and they desired him to follow on to that place.

The logs in question were mixed up in the drive, and he had received no express directions concerning their disposal. No arrangement had been made for their removal from the drive, and no one was near to take special charge of them, or to give new directions as to what should be done with them. At the same time, as between the buyers and sellers, Eldred & Co. and Underhills, the latter were bound to put the logs into the hands of the booming company as the former's bailee

and custodian. Any necessity for separating this small lot from the great mass of the Watson drive at the mouth of the branch had not been contemplated, and under the circumstances it was fairly impracticable. Being thus encumbered with these logs, and having consented to go as far as Big Rapids, in order, if possible, to get his drive into the hands of the booming company, he kept on with the whole to that place.

The Underhills were informed of this proceeding, and made no objection. They manifestly acquiesced, and in the next year, with full knowledge of all the facts, paid Watson for the service.

On arriving at Big Rapids, which was as far as he would go with the drive, it was ascertained that the drive of the booming company, which he had sought to over-take, was still considerably ahead, and that it was not possible to get the logs in question into the hands of Eldred & Co., or into the hands of the booming com-pany, as their bailee and custodian, by means of a junc-tion with that drive. The accomplishment of the sub-stantial end was found to be impracticable in the precise way which had been originally considered as the only feasible one. The logs in question were still on Watson's hands, as they were at the mouth of West Branch. He had no further advice from Underhills in regard to their disposal. They were in the river, intermingled with the others, and according to all appearance, and so far as anything was known on the subject, were in a condition to be rightly taken possession of by Eldred & Co., through the booming company, without qualification.

Eldred & Co. and the other parties desired to get the logs of the Watson drive down to Muskegon that season, and they finally made an arrangement with the booming company to effect that object. Watson was satisfied with the arrangement, but it seems that he went no fur-ther as repects these logs than simply to abandon them to the consignees. The booming company went back and took charge of the drive. Eldred & Co. undertook

43 MICH.—80.

to pay the actual expense for these logs, and the booming company assumed possession on behalf and for the benefit of the former, and ran them down and made delivery in accordance with their orders. What is the unequivocal meaning of the facts? Eldred & Co. had contracted for the logs and had paid money upon them. Underhills, the sellers, were bound to pass the possession to the booming company for them and on their account in the main river, and the logs were on their way in the river therefor, and were as completely open to be taken as they would have been in case they had got down the branch in season and been fallen in with by the main drive.

Eldred & Co. were not bound to remain indifferent spectators, and see the logs become derelict and fall a sacrifice to the failure of an incidental and unimportant circumstance; nor were they bound to incur the trouble and expense of weeding them from the common mass in order to exclude them from their hands on taking control of the others. The absence of the drive had no such serious effect. The parties never intended ît. There was no mistake of fact. Neither was there any fraud or deception. The Underhills had provided no express and immediate agency for a formal giving of possession, and it was not necessary. Transactions are hourly occurring all over the world where possession passes with no greater attention to details and ceremony. The parties declare themselves through their acts, and the law encounters no difficulty in ascertaining what is meant. At the time in question the logs were accessible, and there was nothing in the situation to oppose their being taken.

When considered in the light of all the circumstances, the conduct of Underhills could admit of but one construction. It amounted to a distinct and positive dedication of the possession of the logs to Eldred & Co., through the booming company, and continued, without any offer or apparent ground of revocation or withdrawal, until some time after it had been accepted and acted upon,

and after the rights and interests of third parties had attached. It is unnecessary to cite authorities. The position rests on elementary principles.

The conclusion is that the Underhills virtually offered possession to Eldred & Co. at Big Rapids, and that they accepted the offer and virtually took possession by having the logs there taken into custody at their expense and on their account as owners, by the booming company, and that all right of lien, if any previously existed, and all power to apply the doctrine of stoppage *in transitu* was cut off. The case was given to the jury on wholly different principles, and the right to question the deviation is saved.

The judgment must be reversed with costs and a new trial granted.

The other Justices concurred.