## McELWEE et al. v. METROPOLITAN LUMBER CO.

(Circuit Court of Appeals, Sixth Circuit. July 2, 1895.)

### No. 262.

1. SALE—WHEN COMPLETE.

   The M. Lumber Company made a contract in May, 1892, with one B. for the sale to him of all the product of its mill during the season of 1892. It was agreed that the amount of lumber manufactured each month should be determined by inspectors on the first day of the succeeding month, and that B. should give his notes due in 90 days for the price, less the freight from the M. Company's mill in Michigan to Chicago. It was also agreed that, if B. did not desire the lumber shipped as fast as made, the M. Company would renew B.'s notes for the price so long as the lumber remained in its possession, not exceeding 90 days. At the close of the season, on November 12, 1892, a considerable quantity of lumber remained in the possession of the M. Company, for which notes were outstanding, having been discounted by the M. Company. In January, 1893, B. requested renewals of such notes, under the clause in the contract providing therefor, and new notes were given, maturing in May, June, and July. On May 30th B. failed, and the M. Company at once asserted a right to retain the lumber remaining in its possession. *Held*, that upon the execution of B.'s promissory notes for each month's product of lumber after its inspection the contract of sale thereof was complete, and the title and right of possession passed to B.

2. SAME—VENDOR'S LIEN—REVIVAL.

   *Held*, further, that, although during the running of the original notes no vendor's lien existed, upon the renewal of the notes such lien revived in the M. Company, upon all lumber in its possession, under the provision in the contract for renewal, so long as the lumber remained in its possession, and such lien would have revived upon the insolvency of B. without regard to the contract provision.

3. SAME—WAIVER.

   *Held*, further, that such lien was not waived as to lumber remaining in its possession by partial shipments to B. after the lien revived.

4. SAME.

   It was claimed that, shortly after the close of the season of 1892, in consideration of B.'s executing his note for the lumber, made between November 1st and 12th, before the end of that month, the M. Company had agreed to turn over absolutely to B. all its right and title to the lumber on hand, and thereafter held such lumber as bailee of B. *Held* that, even if such agreement were proved, it would not prevent the revival of a vendor's lien on the lumber actually held by the M. Company upon the expiration of the credit or upon B.'s insolvency.

5. SAME—SUBVENDEE—ESTOPPEL.

   It was also claimed that, at the same time, which was before the expiration of the credit, and while B. had full title and right of possession, it was agreed by the M. Company, in the presence of H. and C., that B. might sell and dispose of all the lumber in its possession. B. afterwards sold parts of such lumber to H. and to C., but no specific lumber was set apart to fill such contracts, and no notice of the sales was given to the M. Company, which renewed B.'s notes in ignorance of them. After B.'s insolvency and the M. Company's assertion of its lien, H. assigned his con-

tract to C., and C., asserting title to the whole amount of lumber, claimed it from the M. Company. *Held*, that the M. Company was not estopped to set up its vendor's lien as against C. or H., whose rights as subvendees were subject, in the absence of estoppel, to the revival of the vendor's lien upon insolvency of the vendee, or otherwise.

6. PROMISSORY NOTES—RENEWALS.

Upon the question whether the notes given by B. in January, 1893, were renewals of former notes or were given for loans of money, the court instructed the jury that, if there was an agreement between the M. Company and B. that there should be renewals of the notes, and that, in order to maintain his credit, the same should be accomplished by B.'s paying his first notes, and giving new ones of similar amount to the M. Company, which should procure their discount, and forward the proceeds to B., such transaction would constitute a renewal of the first notes, the same being a matter of intention, though, prima facie, taking up a note by check is payment. *Held* no error.

7. PRACTICE—FOLLOWING STATE STATUTES—SPECIAL FINDINGS.

The provisions of a state statute requiring the submission of special questions to the jury upon request of counsel, and providing that the findings thereon shall control the general verdict, are not binding upon the courts of the United States. In those courts the effect of inconsistent findings is to be determined by the common law, and not by such statute.

In Error to the Circuit Court of the United States for the Northern Division of the Western District of Michigan.

Two separate actions of replevin, instituted by McElwee & Carney, as plaintiffs, to recover the possession of a large quantity of lumber from the Metropolitan Lumber Company, were by agreement consolidated and tried together. The judgment was against the plaintiffs and for the defendant, in the sum of $29,064.05, the value of the lumber taken from the possession of the defendant by the writ of replevin. The plaintiffs have sued out this writ of error. The facts involved, so far as necessary to be here stated, are as follows: The plaintiffs below, and plaintiffs in error here, were commission merchants and dealers in lumber, engaged in business at Chicago, Ill., and were citizens of the state of Illinois. The defendant was a corporation of the state of Michigan, and was operating a large sawmill for the manufacture of lumber at Metropolitan, in the state of Michigan. On the 25th of May, 1892, the Metropolitan Lumber Company entered into a contract in writing with S. B. Barker, residing and doing business as a dealer in lumber at Chicago, under the firm name of S. B. Barker & Co., for the sale and delivery at Chicago of all the product of its mill then on hand at its mill yard, and all which should be cut during the lumbering season of 1892, estimated at 14,000,000 feet of pine lumber; also all laths and shingles made at the mill during the season. A specific price for each kind and quality of lumber was agreed upon, which included freight from the mill to Chicago. The other provisions of the contract necessary to be stated were as follows: "It is hereby agreed that the amount of lumber, lath, and shingles in pile at said mill on the 1st day of June, 1892, shall be estimated by two inspectors, one to be chosen by each of the parties hereto, or said estimate shall be made by Mr. George Gilbert, if said party of the second part shall prefer; and that such estimate shall be so made on the first day of each month thereafter, of the lumber, lath, and shingles manufactured during each preceding month. The said parties of the second part agree to give to said first party their promissory note, dated June 1, 1892, due in ninety days after date, without interest, for the full amount of the purchase price of the lumber, lath, and shingles then manufactured and estimated as aforesaid; and said second parties agree to give to said first party on the first day of each succeeding month thereafter their promissory note due in ninety days after date, without interest, for the amount of the purchase price of the lumber, lath, and shingles manufactured during each preceding month, and estimated as aforesaid. And it is also agreed that, if said parties of the second part do not desire said lumber, lath, and shingles shipped as fast as estimated as aforesaid, said first party will extend the time on, or renew the notes given for the purchase price of, said lumber, lath, and shin-

gles, so long as the same remains in the possession of said first party, not to exceed ninety days, but upon the express condition that said second parties shall pay such rate of interest on said notes during the time of such extension or renewal as the said party of the first part may have to pay to have said notes discounted. It is further agreed that the final settlement for said lumber, lath, and shingles shall be made on the inspection and measurement thereof made on the dock at Escanaba, Michigan. And it is agreed that the parties of the second part shall take all risk of damage by fire of such part of said lumber, lath, and shingles as may be carried over and not shipped during the season of 1892, and shall pay for all insurance thereon during the time it is so carried over. It is also understood and agreed that the within described lumber, lath, and shingles are to be manufactured in a good and workmanlike manner, as directed from time to time by second party. It is also agreed that, in settling for the lumber each month on estimate, that notes are to be given less the freight to Chicago, viz. $1.50 per M." There was evidence tending to show that the lumber on hand June 1, 1892, was inspected and estimated according to contract, and the negotiable notes of Barker & Co. executed for same to the lumber company, and that on the first of each month thereafter a like inspection and estimate of the lumber cut the preceding month were had, and the notes of the buyer executed therefor, according to the agreement, less $1.50 per thousand, the rate of freight to point of delivery. Purchase-money notes aggregating more than $50,000 were renewed in February, 1893, by notes maturing in May, June, and July, 1893. These renewals were claimed and granted under the provision in the original contract in respect of renewals for notes for lumber remaining in possession of the seller at time renewals should be asked. On the 30th of May, 1893, Barker & Co. failed, at which time more than $40,000 of purchase money remained unpaid, represented by notes, many of which had been indorsed by the lumber company, and discounted for its benefit. At the date of this failure, lumber to the value of $27,234.78 was in the actual possession of the lumber company, being either on the dock at Escanaba, and under the control of the agents of the lumber company, or piled in the mill yard at Metropolitan. Defendant in error at once, upon the failure of Barker & Co., asserted a right to retain the lumber in its possession till the price was paid. The plaintiffs in error, claiming to be purchasers from Barker & Co. of all the lumber which had not been delivered to them at Chicago, demanded possession, and were refused. Thereupon they instituted two actions of replevin in the circuit court, one for the lumber at Escanaba, and another for that in the mill yard at Metropolitan. Plaintiffs in error insisted that the written contract above set out had been modified in many important particulars. The learned district judge submitted a number of questions, to be answered by the jury, in respect of the alleged modification. These questions and the findings thereon are in these words: "First. Was the contract of May 25, 1892, by and between Barker & Co. and the Metropolitan Lumber Company, modified by the parties on or about November 14, 1892? If so, where was the modification made, and was it oral or written? Yes, in Chicago; orally, at Chicago, November 14, 1892. Second. If you find that said contract was modified, was it agreed that Barker & Co. should have possession of the lumber then sawed and in the possession of the Metropolitan Lumber Company under the agreement of May 25, 1892? Yes. Was it agreed that Barker & Co. should have title in said lumber? No. Was it agreed that Barker & Co. should have the right to sell said lumber? Yes. Third. Did the plaintiffs, before bringing suit, demand from the defendants the lumber taken in replevin? Yes." The defendant moved the court to set aside the special finding made by the jury to the question: "Was it agreed that Barker & Co. should have the right to sell said lumber?"—upon the ground that there was no evidence to support the finding. The plaintiffs moved the court for a judgment for the plaintiffs upon the verdict rendered in said cause, on the ground that the general verdict was inconsistent with the special findings of the jury, "and under said special findings, and according to the rules of law, the judgment should be entered for the plaintiffs." Both of these motions were overruled, and judgment entered against the plaintiffs for $27,234.78, the value of the lumber at the time it was seized, and $1.829.27, interest thereon, and for one dollar, the damages sustained, in all $29,064.05.

To all of which the plaintiffs duly excepted. Many exceptions were also taken to the charge as delivered and to the refusal of the court to charge as requested. Such of these exceptions as have been made the subject of an assignment of error, and as are necessary to an understanding of the rulings thereon, appear in the opinion.

F. O. Clark and Hanchett & Hanchett, for plaintiffs in error.

F. D. Mead and Ball & Ball, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

Though the agreement was originally executory, being for the sale of lumber to be manufactured, yet, when the product of a particular month was completed, and it had been inspected and measured, there was a complete bargain and sale of the lumber thus designated. That particular lumber became appropriated to the contract, and the vendee under the agreement was obliged to make his promissory note to the vendor for the price, payable 90 days after date. The element necessary to a perfect and complete sale was supplied by the appropriation of a particular lot of lumber to the contract. In the absence of a contrary intention, clearly expressed by other parts of the contract, the right of property and of possession would vest in the buyer upon the execution of his promissory note payable to the seller. The provision for a final inspection at Escanaba after the delivery had begun was merely for the correction of errors before final settlement, and does not operate to defeat the presumption that title passed when the lumber was first inspected and accepted and conditional payment made. Macomber v. Parker, 13 Pick. 183; Cotton Press Co. v. Stanard, 44 Mo. 71. To say that title remained with the vendor after the lumber had been appropriated to the contract and accepted by the buyer, and after the negotiable notes of the vendee had been delivered in settlement, would leave the vendor liable for loss by fire or other casualty, and the vendee without security for the payment he had made. The clause concerning the risk, from fire, of lumber carried over from the season of 1892, was not interpreted by the defendant in error as leaving the risk with the defendant during the season; for the insurance carried in its own name was, by its own procurement, made payable to Barker & Co., to the extent of their interest. It may be added that, at the date when the right of plaintiffs in error accrued, this insurance had been transferred to Barker & Co. as owners, and was being carried by them. Neither did the provision that the vendor should deliver at Chicago prevent the title from passing before such delivery. Undoubtedly, the general rule is that if the seller obligates himself as a part of his contract to deliver the property to the buyer at some specified place, title will not pass until such delivery. The Venus, 8 Cranch, 275; Sneathen v. Grubbs, 88 Pa. St. 147; Benj. Sales, §§ 325, 377; Com. v. Greenfield, 121 Mass. 40. "Slight evidence," says Mr. Benjamin, "is, however, accepted as sufficient to show that title passes immediately on the sale, though the seller is to make a delivery. The question, at last, is one of in-

tent, to be ascertained by a consideration of all the circumstances." Benj. Sales, § 329. Here the lumber cut, inspected, and measured was completely identified. Nothing more remained to be done to put it in a deliverable condition. It was then paid for. The delivery might be delayed by the neglect of the seller, or for the convenience of the buyer. In paying for the lumber, the price of the freight was deducted. Under such circumstances, it would be difficult to say that, if the lumber should be destroyed without fault of the seller, the loss would not fall on the buyer. Terry v. Wheeler, 25 N. Y. 520, is much in point. That was a case of the sale of lumber which was selected by the buyer, and measured and piled in the yard of the seller, and the price was paid. The seller, however, agreed, as part of the contract, to deliver the lumber free of charge on board of the cars, no time being specified. The lumber was destroyed by fire on the day of sale, and the buyer sued to recover his purchase money. Selden, J., said:

"No case has been referred to by counsel, nor have I discovered any, in which, where the article sold was perfectly identified and paid for, it was held that a stipulation of the seller to deliver at a particular place prevented the title from passing. If the payment was to be made on or after the delivery, at a particular place, it might fairly be inferred that the contract was executory, until such delivery; but where the sale appears to be absolute, the identity of the thing fixed, and the price for it paid, I see no room for an inference that the property remains the seller's merely because he has engaged to transport it to a given point. I think in such case the property passes at the time of the contract, and that in carrying it the seller acts as bailee and not as owner." Hobbs v. Carr, 127 Mass. 532; Weld v. Came, 98 Mass. 152; Lingham v. Eggleston, 27 Mich. 324; Underhill v. Booming Co., 40 Mich. 660; Booming Co. v. Underhill, 43 Mich. 629, 5 N. W. 1073; Steam Mill Co. v. Brown, 57 Me. 9; Hatch v. Oil Co., 100 U. S. 135; Dyer v. Libby, 61 Me. 45.

The passage of title does not militate against the existence of a vendor's lien. Such a lien arises upon the vesting of the title in the vendee, and is a mere right of the vendor to retain possession until the price is paid. If the title remains with the vendor, there is no lien; and this was explicitly stated to the jury, who distinctly found in their general verdict that the appellee had a vendor's lien. If such a lien existed when appellants replevied the lumber involved, it arose in consequence of facts occurring after the vendee gave his original notes. The agreement to give credit for 90 days after each installment of lumber was placed in a deliverable condition, and had been inspected and estimated, was wholly inconsistent with any right of the vendor to retain possession until the price was paid. The duty of immediate delivery, credit having been given, was wholly inconsistent with a right to hold as security for the purchase price.

"Selling goods on a credit means ex vi terminorum that the buyer is to take them in his possession, and the vendor is to trust to the buyer's promise for the payment of the price at a future time." Benj. Sales (Corb. Ed.) § 1182.

The doctrine is well stated in the leading English cases of Bloxam v. Sanders, 4 Barn. & C. 941, and Bloxam v. Morley, Id. 951, by Bayley, J., who thus stated the general principles concerning the lien of a vendor of goods:

"The vendor's right in respect of his price is not a mere lien which he will forfeit if he parts with the possession, but grows out of his original ownership·

and dominion. If goods are sold on credit, and nothing is agreed on as to the time of delivering the goods, the vendee is immediately entitled to the possession, and the right of possession and the right of property vest at once in him; but his right of possession is not absolute; it is liable to be defeated if he becomes insolvent before he obtains possession. Tooke v. Hollingworth, 5 Term R. 215. If the seller has dispatched the goods to the buyer, and insolvency occur, he has a right, in virtue of his original ownership, to stop them in transitu. Why? Because the property is vested in the buyer so as to subject him to the risk of any accident. But he has not an indefeasible right to the possession, and his insolvency, without payment of the price, defeats the right. The buyer, or those who stand in his place, may still obtain the right of possession if they will pay or tender the price; or they may still act on their right of property, if anything unwarrantable is done to that right. If, for instance, the original vendor sell when he ought not, they may bring a special action against him for the damage they sustain by such wrongful sale, and recover damages to the extent of that injury; but they can maintain no action in which the right of property and the right of possession are both requisite, unless they have both those rights."

Thus, after the execution to the vendor of the promissory notes of the vendee, the title or right of property and the right of possession to the lumber embraced within each monthly settlement were vested in Barker & Co. The actual, manual possession was with the Metropolitan Lumber Company, which was under obligation to deliver to the buyer as delivery should be required. Delivery could not be refused unless one of two things should occur before the actual possession was surrendered, namely, insolvency of the buyer or non-payment of the price when the credit expired. In case of the happening of either of these contingencies before the actual possession of the lumber passed from the seller to the buyer, the vendor's lien, which had been waived by a sale on a credit, would revive, and the vendor might lawfully retain his possession until the price was paid. Even if goods have been delivered to a carrier consigned to the vendee, and insolvency occurs before they reach the actual possession of the buyer, the vendor may exercise the right of stoppage in transitu to recover his possession, and thereby revive his lien. The right of stoppage in transitu is but an equitable extension or enlargement of the vendor's lien, and is not an independent or distinct right. 2 Benj. Sales (Corb. Ed.) §§ 1229–1245; Loeb v. Peters, 63 Ala. 249; Babcock v. Bonnell, 80 N. Y. 244. In the very well considered case of White v. Welsh, 38 Pa. St. 420, it was said by the court that:

"Judges do not ordinarily distinguish between the retainer of goods by a vendor and their stoppage in transitu on account of the insolvency of the vendee, because these terms refer to the same right, only at different stages of perfection and execution of the contract of sale. If a vendor has a right to stop in transitu, a fortiori he has a right of retainer before any transit has commenced." "The rule is," said the court, "that so long as the vendor has the actual possession of the goods, or as long as they are in the custody of his agents, and while they are in transit from him to the vendee, he has a right to refuse or countermand the final delivery, if the vendee be in failing circumstances."

Unless, therefore, the actual possession had been surrendered before the alleged change in the contract, to be hereafter considered, the vendor's lien would revive, in case insolvency occurred before delivery or the period of credit expired and the price was unpaid.

The effect upon the vendor's right of the expiration of the period of credit while the actual possession is with the vendor is thus stated:

"When goods have been sold on credit, and the purchaser permits them to remain in the vendor's possession till the credit has expired, the vendor's lien, which was waived by the grant of credit, revives upon the expiration of the term, even though the buyer may not be insolvent." Benj. Sales (Corb. Ed.) § 1227.

This revesting of the lien is not affected by the fact that the seller had received conditional payment by promissory notes or bills of exchange, nor by the fact that such notes or bills had been negotiated so that they were outstanding when they matured, or unmatured and outstanding when the insolvency occurred. Benj. Sales (Corb. Ed.) §§ 1130–1185, and note 4; Valpy v. Oakeley, 16 Q. B. 941; Griffiths v. Perry, 1 El. & El. 680; Grice v. Richardson, L. R. 3 App. Cas. 319; White v. Welsh, 38 Pa. St. 420; Wanamaker v. Yerkes, 70 Pa. St. 443; Arnold v. Delano, 4 Cush. 33; Townley v. Crump, 4 Adol. & E. 58. The liability of defendant in error as indorser on such notes as had been negotiated operated to continue the relation of an unpaid vendor. The right of retention is not a right of rescission, and it is not essential to the revival of the lien that the notes of the purchaser shall be delivered up or ready for delivery, though in Arnold v. Delano, cited above, it seems to have been so regarded. If, after the revival of the vendor's lien by expiration of the credit, the seller extended further credit by taking renewal notes, payable at a future date, the revived lien would be waived, unless there was some agreement that this further credit should not have that effect, and that the seller should hold the property as security for the renewal notes. This state of things seems to have been contemplated by the parties; for, by one of the clauses of the original contract, a provision was made for renewals or extensions for such time as the lumber in the actual possession of the vendor when an extension was granted should "remain in the possession" of the lumber company, "not exceeding ninety days." The reasonable construction to be placed upon this provision is that the revived lien, resulting from the expiration of the original credit, should not be waived by renewal of purchase notes and an extension of credit. Before such extension, the buyer undoubtedly had the right of property and right of possession. After such renewals, all right of possession till the renewal notes were paid was lost. Independently of the agreement that extended credit should not waive the lien which had been revived by expiration of original credit, the insolvency which occurred during the running of the renewal notes would operate to revive the suspended lien, and, between vendor and vendee, or a subvendee standing on no higher ground than the vendee, the defendant in error had a right to hold the possession till the renewal notes were paid. The authorities already cited fully sustain this position. Aside from all questions arising on the alleged modification of November 14, 1892, and all questions of estoppel, the rights of the defendant in error, in the actual possession of lumber which had not been paid for, would not be affected by a sale to a third person. Such a subvendee would buy subject to the right of the vendor to hold

possession as security for renewal notes; and, without regard to this special agreement, a subvendee would take subject to the possibility that before possession was obtained the lien might be revived by insolvency of the vendee or expiration of the stipulated credit. These considerations lead us to the conclusion that the rights of the plaintiffs in error, as subvendees, must, as the learned judge who presided at nisi prius instructed the jury, depend either upon questions of estoppel or upon the legal effect of the modification in the contract as defeating any right of lien in the vendor.   The construction given the original contract that the title did not vest in the purchaser till delivery at Chicago, though erroneous, was harmless. It is a matter of no moment to plaintiffs in error whether the defendant in error had a right of retention by reason of the fact that it had not parted with the title or because it had a vendor's lien.   In either case, plaintiffs in error must fail in this action.

Before passing to a consideration of the terms and effect of the modifications claimed, it is proper to consider the contention of plaintiffs in error, presented by several requests for special charges refused by the court, that the so-called renewal notes were not in fact renewals, but independent loans to Barker & Co. by defendant in error.   There was evidence that all these subsequent renewals were claimed and allowed upon the theory that the provision of the original contract concerning renewals was still in force.   The letter of Barker to the lumber company of January 20, 1893, uses this language:

"Now, in regard to the lumber left over from last year, our contract says you are to renew our notes for amount of lumber left in your hands. * * * We have from seventy to eighty thousand dollars in lumber, so we shall expect you to arrange to carry, or renew, as you prefer, at least $50,000 next month. The balance we will pay. We will send you our notes for that amount February 1st, or, if you wish to arrange it differently, let us know. Fifty thousand dollars we wish to pay in May, and will make our notes due in May. Let us hear from you."

Again, on January 27, 1893, Barker wrote:

"We only ask for renewals for the amount of lumber you have on hand after all the notes are paid up to that amount. Our estimate of the value is $85,000.00."

The evidence showed that renewals to the amount demanded were made in February, March, and April, 1893, and notes given payable in May, June, and July, 1893.   These extended notes were discounted by defendant in error.   There was evidence tending to show that the notes of Barker & Co. had been discounted by the vendor, and that, in advance of their maturity, it was arranged that Barker & Co. should meet them severally at maturity, but that new notes of Barker & Co., corresponding in amounts and dates with the maturing notes, should be sent to the lumber company, who should indorse and procure their discount, and forward the proceeds to Barker & Co.   There was evidence that this plan was carried out, and Barker & Co. produced the matured notes and their canceled checks, by which they had been paid.   The contention of the lumber company was that this plan of renewing was with the intent and purpose that the new notes should in fact stand as renewal notes.   The court,

after in substance stating the contention of the parties as to this question, instructed the jury as follows:

"Now, the taking up of a note by giving a check for it is prima facie a payment of the note, but it is not necessarily a payment. If there was an agreement—an understanding—that there should be renewals, and if it was expressly or manifestly agreed that the renewals should be accomplished in the way in which defendant claims they were made in this case, they were renewals, and it would not lie in the mouth of Barker & Co., or anybody claiming under them, to insist afterwards that they were not renewals. After all, it is a matter of intention. If I agree with a party to renew his note, but I say, 'Here, I want you to go and take that note up by your own check, and the next day I will take your note and have it discounted, and give you the proceeds,' that would amount to a renewal. You can see for yourselves, gentlemen, if you have ever had any dealings with banks, that there might be a very sufficient reason for adopting that course. The man who does business in a bank impairs his credit by going repeatedly to have a note renewed, because it is taken as an indication of slender means, or of being hard pressed. And banks generally require that notes be paid after the second, or, at the most, the third, renewal. Now, that might be a reason, if these parties desired to maintain their credit, that the party should ostensibly take up the note. That, so far as the bank was concerned, would be a payment. Then, if, in a day or two, another note should be presented, and that should be discounted as a new transaction (I don't say that was so in this case; I only state this by way of illustration),—if anything of that sort was done, the transaction, taken altogether as between the parties to it, would be a renewal, and not a payment. The claims of the plaintiffs are that these were payments, and that the subsequent notes were merely loans, under which the Metropolitan Lumber Company became an accommodation party by indorsing the notes and securing money for Barker. It is for you to decide what is the true version of the facts."

We find no error either in the charge or in the refusal to charge on this matter. The question of payment was one of intention, and, under the evidence, was one for the jury.

This brings us to the legal effect of the alleged modifications of November 14, 1892, upon the rights of the parties; for, unless that modification materially changed the agreement, the renewals allowed in February following would continue a vendor's lien for the security of the renewal notes. Concerning this modification, the evidence tended to show that the mill of defendant in error closed down about the 11th or 12th of November, 1892. All the lumber theretofore cut, except such as was sawed after October 31st, had been inspected and settled for by the notes of the vendee. The lumber sawed between October 31st and the closing of the mill was inspected and estimated under the contract, and was in value something over $9,000. The purchaser was not required, under the contract, to give notes for any lumber until the end of the month. Defendant in error wished, however, to settle up this matter at once, and therefore requested that Barker & Co. would give their notes for this remnant without waiting, as they had a right to do, until December 1st. Barker & Co. were at first unwilling, and the contention of the plaintiffs in error is that Barker & Co. did execute notes for the November cut, upon certain concessions being made. The view which they took as to these concessions, and the legal effect thereof, appears by two requests, which were as follows:

"If you believe from the evidence that, on or about the 14th of November, 1892, the defendant agreed to turn over absolutely all its right, title, and

interest in the lumber in question to S. B. Barker & Co. if the said S. B. Barker & Co. would give to said defendant its notes for the estimated amount of lumber sawed up to the time the mill shut down in November, 1892, and that the said defendant company also agreed to assign to the said S. B. Barker & Co. the insurance policies upon all the lumber on hand at the mill at Metropolitan in consideration of the making of said notes, and if you believe that the notes of $9,000 in evidence in this case were given in accordance with such agreement, then the said S. B. Barker & Co. became the absolute owner of the said lumber, even if the notes given by the said S. B. Barker & Co. February 20, 1893, and March 31, 1893, were renewals or not; and, if you so believe, your verdict should be for the plaintiffs.

"If you believe from the evidence that, in accordance with the agreement of Nov. 14, 1892, the defendant company agreed to turn over absolutely all of its lumber cut during the year 1892, together with the insurance policies thereon, provided S. B. Barker & Co. would execute the notes of $9,000, in evidence in this case, in addition to those already given, and if you believe that, in accordance with said agreement, the said defendant delivered to the said S. B. Barker & Co., or by its order, a portion of the said lumber, and assigned the insurance policies in evidence in this case to said S. B. Barker & Co., then your verdict in this case should be for the plaintiffs."

These requests were properly refused. Each absolutely ignores the distinction between the right of possession and actual possession. Whether the new agreement as to possession operated to change the character in which the lumber company thereafter held possession, and the effect, if any, in preventing a revivor of a vendor's lien, is the crux of this case, and will be hereafter considered. These requests imply that a mere agreement by which the title and right of possession vested in Barker & Co. would operate to prevent the subsequent attachment of a vendor's lien as a result of renewals, or as a consequence of insolvency before payment. Neither presents any question of estoppel operating to prevent the vendor from setting up a lien against subvendees. On this subject the jury were in substance and effect instructed that the plaintiffs could not recover unless it was found that the modification gave to Barker & Co. not only the title and the right of possession, but also an unqualified right to sell and transfer the lumber to third persons, and that this right of sale had been exercised in favor of plaintiffs. The charge more than once assumed, and in distinct terms instructed the jury, that there had been no change of possession; that the possession at time of insolvency was with the vendor. The language of the court in one place, in respect of possession at time of insolvency, was that:

"If the goods were not actually removed from the possession of the Metropolitan Lumber Co. before Barker & Co. failed,—and there is not any question on that point in this case, because by the testimony it remained in the possession of the Metropolitan Lumber Co. until after the failure of Barker & Co.,—why then the company could hold it against Barker & Co."

The objection most earnestly insisted on to this charge is that the court drew no distinction between an actual and constructive possession by the vendee; that it ignored the possibility that the vendor may, by agreement, make a constructive delivery to the vendee, and remain in possession as agent or bailee of the vendee. Though this question is now much pressed, it is noticeable that there is no distinct recognition of the question, either in the charge or requests for charge. The only way in which it can now be made

the subject of an assignment of error is by the suggestion that the court assumed that there had been no constructive transfer of possession because the actual possession remained with the defendant in error. There is no evidence in this record which would justify a finding that there was an agreement that, after the modifications of November 14th, the vendors should no longer remain in possession as vendors, but should thereafter hold as agent or bailee for Barker & Co. Upon the contrary, the construction placed upon the agreement, after the alleged modifications, by both parties, was wholly inconsistent with any change in the character in which the vendor remained in the actual possession. The claim of Barker & Co. for an extension of credit was made upon the clause providing for renewals while the vendors remained in possession, and the whole correspondence was based upon the theory that the lumber would stand as a security for the renewal notes. On the evidence before the jury, it was not error to assume, as the trial judge did, that at the occurrence of the vendee's insolvency, there had been no delivery to the vendee, either actual or constructive. Neither do we think that it would follow, if there was such evidence, that a mere agreement, express or implied, by an unpaid vendor, to hold possession as bailee or agent for the vendee, would operate as such a delivery to the vendee as to prevent the revivor of the vendor's lien if the vendee should fail before the actual possession was lost. It is to be borne in mind that this right of the vendor springs out of the relation of the parties and the natural equity that the vendor shall not be compelled to complete a contract by delivery when the vendee has not paid the price, or by insolvency becomes unable to carry out his side of the agreement. As put by Bayley, B., in Miles v. Gorton, 2 Cromp. & M. 511:

"Although everything may have been done so as to divest the property out of the vendor, and so as to throw upon the vendee all risk attendant upon the goods, still there results to the vendor out of the original contract a right to retain the goods until the payment of the price."

The case of Barrett v. Goddard, where the opinion was by Justice Story on circuit, and reported as No. 1,046, Fed. Cas., is much relied upon by plaintiffs in error. That case is, however, exceptional, and is founded for the most part on Hurry v. Mangles, 1 Camp. 452, where the rights of a subvendee had intervened, who had bought and paid for the goods, and then paid rent to the vendor as warehouseman. In Miles v. Gorton, 2 Cromp. & M. 506, Hurry v. Mangles was distinguished, upon the ground that the vendor, by receiving rent from a subvendee, had delivered the goods to the subvendee, and thereafter held as agent for the subvendee and not as agent for the vendee. The other cases cited by Justice Story are cases where the question was one of delivery to the vendee under the statute of frauds, and are applicable only in respect of questions upon the formation of the contract. There is a clear distinction between a delivery which will suffice to take a case without the statute of frauds, and an agreement of a vendor to hold in the character of bailee for the vendee, as a delivery sufficient to divest the vendor's lien or prevent its revival on insolvency or expiration of period of

credit. Benj. Sales (Corb. Ed.) §§ 1131–1134, 1187; Miles v. Gorton, 2 Cromp. & M. 504; Hurry v. Mangles, 1 Camp. 452; Tanner v. Scovell, 14 Mees. & W. 28–37; Townley v. Crump, 4 Adol. & E. 58; Grice v. Richardson, L. R. 3 App. Cas. 319. The case last cited is an opinion of the house of lords, and was decided as late as 1877. The doctrine of Miles v. Gorton, heretofore cited, was distinctly affirmed. In that case it appeared that the vendors were warehousemen, and made an arrangement with the purchasers that they should pay warehouse rent, and the sale was on a credit. It was held—First, that unless actual possession of goods sold has been delivered to the purchaser, the vendor is not deprived of his right of lien as against the assignee of the purchaser in the event of insolvency; second, that, as the goods remained in the possession of the vendors, and no actual delivery had been made to the purchaser, the vendors' lien revived upon the insolvency of the vendee, notwithstanding the vendors had become bailees for the vendee. The case was argued by Mr. Benjamin, the learned author of the work on Sales of Personal Property, in favor of the view announced by the house of lords. Other English cases bearing upon the question are: Dodsley v. Varley, 12 Adol. & E. 632; Valpy v. Oakeley, 16 Q. B. 941; McEwan v. Smith, 2 H. L. Cas. 309.

The conclusion we reach upon the foregoing questions may be summarized thus:

1. That the title and right of possession passed to Barker & Co. upon execution of their promissory notes as each month's product of finished lumber was inspected and received.

2. That during the running of the original notes no lien existed, and during the credit the vendees had a right to demand and take actual possession or make subsales to third persons.

3. That the lien of the vendor would revive upon expiration of the stipulated credit, without regard to the solvency of the vendee, or upon the insolvency of the vendee before or after maturity of purchase notes, and regardless as to whether such notes were outstanding or in the hands of the vendor.

4. That the renewal of matured purchase-money notes and the extension of a further credit would operate as a waiver of the lien which had revived upon the expiration of the original credit, unless there was an agreement to the contrary.

5. That the clause providing for renewal notes provided that this extended credit should not operate to waive the revived lien, by providing that the lumber should remain in the possession of the vendors till the renewal notes were paid.

6. That there was no evidence that the contract was subsequently modified so that the character in which the vendor thereafter held possession should be as bailee for the vendee, and not as vendor.

7. That, were it otherwise, such an agreement would not be such a delivery to the vendee, or loss of possession by the vendor, as would prevent the assertion of a vendor's lien upon expiration of the first or second stipulated credit, or upon the insolvency of the vendee before surrender of the actual possession. A fortiori, an agreement that the vendor should renew the vendee's notes and hold

possession till payment of the renewed notes would be unaffected by the alleged agreement to hold as bailee for the vendee. The one agreement would be inconsistent with the other during the running of the extended credit, and, between vendor and vendee, the agreement under which notes were renewed would supersede the agreement to hold as bailee.

Entertaining these views, it is clear that, if the defendant in error is debarred from asserting a vendor's lien upon the insolvency of the vendee, it must be because the plaintiffs in error have acquired rights as subpurchasers which the vendor is estopped to deny or contravene by the assertion of a lien. What are these rights, and what is their origin? As mere subpurchasers of lumber in the actual possession of the vendor, they only acquire the right and interest of the vendee. If, at the time they bought, the vendor had no lien, no right of retention, then they would acquire the right to demand delivery. But the right of a vendee who has bought on a credit is not an absolute right to demand delivery. The right is dependent upon the preservation of his credit, and, if he becomes insolvent before he obtains actual possession, the lien of the vendor revives, and the insolvent vendee must pay the purchase price before he can deprive the vendor of the goods remaining in his possession. So, if the vendor, for any reason, remain in the actual possession until the period of credit has expired, his lien revives. Now, a subvendee buys only this defeasible right of the vendee; and, if he does not obtain the actual possession or obtain from the vendor an actual attornment to him, as in Hurry v. Mangles, cited heretofore, and the credit given the vendee expires while the vendor holds the actual possession, or the vendee becomes insolvent, he cannot, in the absence of some estoppel, deprive the unpaid vendor of his actual possession. The rights of subvendees have most often been under consideration in cases involving the doctrine of stoppage in transitu. But the principle is the same where transit has not begun. It was well said in White v. Welsh, 38 Pa. St. 420, that, "if a vendor has a right of stoppage in transitu, a fortiori he has a right of retainer before any transit has begun." Now the right of stoppage in transitu, special legislation out of the way, can only be defeated by the transfer of a bill of lading to an indorsee who bona fide gave value for it. Benj. Sales (Corb. Ed.) § 1285; Lickbarrow v. Mason, 1 Smith, Lead. Cas. (Ed. 1879) 753. It will not be defeated by a mere assignment while in transit, or by an attachment by creditors of vendee. Benj. Sales (Corb. Ed.) § 1242; Mississippi Mills v. Union & Planters' Bank, 9 Lea, 318; White v. Mitchell, 38 Mich. 390; Harris v. Pratt, 17 N. Y. 249; Umber Co. v. O'Brien, 123 Mass, 12–14; Calahan v. Babcock, 21 Ohio St. 281; Stanton v. Eager, 16 Pick. 476; Wood v. Yeatman, 15 B. Mon. 273; Loeb v. Peters, 63 Ala. 243. No subsale during transit will defeat the right, unless the bill of lading be transferred. In the late case of Kemp v. Falk, L. R. 7 App. Cas. 573–582, it was said by Lord Blackburn that "no sale, even if the sale had actually been made with payment, would put an end to the right of stoppage in transitu." Now, what is the attitude of plaintiffs in error? Evidence was introduced of the execution of a series of

promissory notes by the Hines Lumber Company and payable to S. B. Barker & Co., all dated December 13, 1893, and payable at different dates, and aggregating some $40,000.    A receipt was given for these notes by Barker & Co., which concluded as follows:

"To apply on the purchase from me of one and one-half (1½) million feet of my good strips, now in cross-pile at Metropolitan, Mich., and on five hundred (500,000) thousand feet of 1¼", 1½", 2", and 3" selects, likewise in pile at Metropolitan, Mich., to be delivered by me along at intervals, within 60 days after the opening of navigation, at $18.50 per. M. for the strips and $28.50 per M. for the thick selects, delivered on their dock in Chicago. It is understood, and I agree to extend each and all of the above notes for the same period as they are now given, with interest at going rate of interest, if the Edward Hines Lumber Co. desire the notes extended.

"S. B. Barker & Co. [Seal.]"

Another contract, between S. B. Barker & Co. and McElwee & Carney, was also introduced, which reads as follows:

"Chicago, Dec. 29, 1892.

"We have this day sold to McElwee & Carney, of Chicago, five million feet of pine lumber, shingles, and lath, piled on Metropolitan Lumber Co.'s docks at Metropolitan, Mich., and described as follows, to wit: Common boards, 8, 10, 12, 14, and 18 inches wide, one million three hundred and thirty (1,330) thousand feet, at thirteen (13) dollars per M.; strips three hundred (300) thousand feet, at eighteen (18) dollars per M.; saps six hundred and fifteen (615) thousand feet, at twenty-two (22) dollars per M.; culls four hundred and forty-seven (447) thousand feet, at seven (7) dollars per M.; shorts three hundred and twenty-five (325) thousand feet, at ten (10) dollars per M.; eleven hundred (1,100) thousand extra shingles, at two dollars and twenty-five ($2.25) cents per M.; six hundred and thirty-eight (638) thousand lath, at one dollar and ($1.40) forty cents per M.; and do hereby deliver to said McElwee & Carney all of said lumber, shingles, and lath, situated at Metropolitan, in Dickinson county, and state of Michigan, and do hereby authorize them or their agents to take immediate possession of the same. Said McElwee & Carney have paid on said lumber, shingles, and lath the sum of forty-five thousand nine hundred and sixty-seven ($45,967.00) dollars.

"S. B. Barker & Co.

"Witness: W. J. Carney."

Now, neither of these contracts designates any particular piles of lumber intended to be sold, and no separation was ever made of that which was sold from that unsold.    Some cargoes of lumber consigned to Barker & Co., and delivered to Barker & Co., were, on the evidence, applied on these contracts in the spring of 1893.    But it is clear that the title and right of property to any particular lumber remaining in the possession of the Metropolitan Lumber Company did not vest in either of these subpurchasers.    Clearly these sales were incomplete and inoperative to pass title or right of possession to any particular lumber until lumber should be thereafter set apart and applied on the contracts.    Cherry Val. Iron Works v. Florence Iron River Co., 12 C. C. A. 306, 64 Fed. 569–575.    In this situation matters remained until after the failure of the vendees; no notice of any such sales having been given to the defendant in error until after it had renewed over $50,000 of the matured notes of Barker & Co. in ignorance of any such subsales and in reliance upon the right conferred by the original agreement to hold the lumber in its possession at time of such renewals until the renewal notes should be paid.    The case is even stronger; for Barker & Co. claimed

and obtained renewals upon the basis of the right secured under the contract, and gave no notice that third persons had acquired any rights which could be affected by renewals. It is true that, in a letter dated May 3, 1893, written by Barker & Co. to the Metropolitan Lumber Company, there does occur a casual reference that a sale of "some lumber" had been made to the Hines Lumber Company, and that the cargoes theretofore shipped had not been conveniently loaded for filling this sale. This casual reference to a sale to be completed by a delivery at Chicago out of lumber consigned to Barker & Co. carried with it no notice of the rights now claimed, and was subsequent to the renewal notes. No assent to the sale was asked or given, and the Hines Lumber Company in no way changed its position as a consequence of the silence of the defendant in error after the letter of May, 1893. There is no pretense of notice of the sale to McElwee & Carney, until after the insolvency of Barker & Co. The fact that defendant in error delivered several cargoes of lumber after the renewal of many of the notes of Barker & Co. did not affect their lien upon that undelivered. Such partial delivery operates as a delivery of the whole only when the intention is plain that such partial delivery was intended as a symbolical delivery of the whole and as a waiver of any right of retention as to the remainder. Benj. Sales (Corb. Ed.) §§ 1191–1195. The author just cited concludes a discussion as to the effect of partial delivery upon the lien of the vendor on the remainder by saying:

"No case has been met with where the delivery of part has been held to constitute a delivery of the remainder, when kept in the vendor's own custody." Section 1195.

To obviate the fact that title had not passed to either the Hines Lumber Company or McElwee & Carney under their several bills of sale (and that no action of replevin or trover would lie to recover any specific lumber), the Hines Lumber Company, after a demand for delivery and a refusal, made an assignment of its claim to the plaintiffs in error, which is dated after defendant in error had asserted its lien, and is in these words:

"Escanaba, Michigan, June 5th, 1893.

"The Edward Hines Lumber Co., of Chicago, Illinois, as party of the first part, does hereby sell, assign, and set over to Robert H. McElwee and William J. Carney, of same place, all the lumber purchased by said company from S. B. Barker & Co., of Chicago, about December 15, 1892, and which said Barker & Co. purchased from the Metropolitan Lumber Company, of Dickinson county, Michigan, and which is now in the yards of said Metropolitan Lumber Company, at Metropolitan, Dickinson county, Michigan. This sale is in consideration of one dollar and other valuable considerations. Edward Hines Lumber Co.,

"By E. Hines, Prest."

Thereupon McElwee & Carney, claiming that by uniting these two contracts the entire remainder of undelivered lumber vested in them, brought these actions of replevin for the possession of all the lumber sawed for Barker & Co. remaining in the possession of defendant in error. It is unnecessary to determine whether this merger of both contracts in the same person operated to vest title in the whole mass in the assignee. Assuming that it did so, if the remainder was

less than the aggregate of both sales, then what follows?   The best that can be said, favorable to plaintiffs in error, is that on the 5th of June, 1893, they for the first time obtained the title and right of Barker & Co. to the specified lumber involved in this controversy. Before the title to any part of this lumber vested, Barker & Co. had failed.   Thereupon, the vendor's lien reattached, even assuming that it had been suspended by reason of the extended credit, and had not been saved as an effect of the stipulation concerning renewals. On this state of facts, the observation of Lord Blackburn, in Kemp v. Falk, L. R. 7 App. Cas. 582, is in point, that:

"Why an agreement to sell, unless it was made in such a way as to pass the right of property in the goods sold, should be supposed to put an end to the equitable right to stop them in transitu, I cannot understand." "I am quite clear," adds his lordship, "that it does not."

If we are right in these conclusions, it follows that defendant in error is entitled to assert its vendor's lien, unless still other aspects of the case shall raise an estoppel.   Plaintiffs in error say that an estoppel arises as a consequence of an alleged agreement of November 14, 1892, by which it was agreed that Barker & Co. might sell and transfer the lumber for which they had made conditional payments, and that this agreement was made in the presence and hearing of representatives of both the Hines Lumber Company and McElwee & Carney, and that they bought in reliance upon the agreement thus made.   Plaintiffs in error further say that one of the questions submitted to the jury was this: "Was it agreed that Barker & Co. should have the right to sell said lumber?"—and that the jury made a special finding that it was so agreed.   The instruction upon this aspect of the case was altogether too favorable to the plaintiffs in error.   The court was requested by the defendant in error to charge as follows:

"(7) If Barker sold the lumber, or any portion of it, to the plaintiffs, in December, 1892, as claimed, and the Metropolitan Lumber Company was not notified or advised of such sale, and Barker continued to deal with the lumber, and gave directions in regard to it, the same as before, and the plaintiffs, so far as the Metropolitan Lumber Company knew, did not undertake to exercise any control over it, and the Metropolitan Lumber Company had no knowledge of any such transfer, and, relying on the supposed fact that Barker was still the owner of the lumber or whatever interest had passed to him by the written contract and the subsequent dealings between them, and on the lumber still remaining in its possession extended the time of payment, or renewed the notes given for the purchase price, the plaintiffs are estopped from claiming under such transfer, except subject to the right of the Metropolitan Lumber Company to retain the lumber until the renewals were paid."

To this the court responded by saying:

"That is so, gentlemen, unless there was a right of sale extended by a modification under the contract of November 14, 1892. As I have already repeatedly said to you, if that right was given to Barker, it was a voluntary relinquishment on the part of Stack or the Metropolitan Company of all the lien upon the entire mass of lumber, and reducing all of the notes that they had, amounting to some $110,000, to mere obligations of Barker & Co., without any security whatever; and it would not make any difference, if Barker & Co. made a sale under those conditions, whether the Metropolitan Company was advised of it or not.   They could not be supposed to have renewed the notes after making such a stipulation as that, relying upon the lumber as security.   If you find that such was the fact, then Barker might sell,

clear of all claim which they might have, because that would be the effect of the agreement that Barker should have an unqualified right of sale."

We have said that this charge was more than plaintiffs in error were entitled to, and for these reasons:

This alleged modification was, in fact, no modification whatever of the original contract. The title and right of possession was already vested in Barker & Co. The vendor's lien had been waived by the credit given, and it had not been revived at the date of the alleged agreement by expiration of the credit or by the occurrence of insolvency. Having the title and right of possession, Barker & Co. could have obtained the actual possession, or required the lumber to be delivered to another as subpurchaser, assignee, or pledgee. The refusal of a vendor without a lien to deliver to such subpurchaser, assignee, or pledgee would have been a conversion. All that is shown by the evidence upon this point amounts to nothing more than a claim by Barker & Co. of their clear legal rights, as matters then stood, and a recognition of those rights by the vendor. Not one word was said as to revivor of a lien in favor of the vendor if insolvency should occur, or when the period of credit should expire, and there was no evidence upon which a jury would have been authorized to find that it was agreed that no lien or right of retainer should arise by the happening of contingencies which neither party then apprehended. Neither was any reference made to the question of renewal notes and the right to retain possession in case an extension of credit should be asked under the clause relating to renewals. Mr. Carney, one of the plaintiffs in error, had negotiated the original contract of sale, acting as agent for the Metropolitan Lumber Company. He therefore knew of the provision concerning renewals in the agreement as it stood. A written contract may be modified by parol, and a stipulation waived or new terms included. But the written agreement of the parties will be presumed to continue, so far as an alteration or modification is not clearly shown. Not one word was said or done which seems to have been intended to modify this stipulation for renewals, and the parties themselves interpreted the so-called modification as not waiving or affecting that provision; for renewals were thereafter applied for by Barker & Co., and granted upon the theory that the lumber company was obligated to allow renewals so long as the lumber undelivered should remain in its possession. There was, therefore, no evidence which would justify a finding that the vendor might not assert a lien on expiration of the period of credit, or upon insolvency of the vendee, or in the event the vendee should claim and obtain renewals. The special finding of the jury as to the agreement concerning a sale by the vendee was, therefore, inconclusive, and can be given no legal effect in estopping the vendor from claiming a lien on granting an extension of credit or upon the insolvency of the vendee. Plaintiffs in error must be taken to have made their contract as subvendees with knowledge of the terms of the original agreement, and with knowledge that the actual possession was with the vendor, and with knowledge of the law which would give to the vendor a right of retention on insolvency of the vendee. They could have protected themselves by giving notice of their purchase and taking actual possession be-

fore the lien of the vendor should be revived by any of the contingencies which would revive a suspended lien. This they did not do. Upon the contrary, they neither gave notice nor demanded delivery. In ignorance of any rights of subvendees, defendant in error was induced to grant renewals in reliance upon possession, and there is no such counter-equity as should deprive it, as an unpaid vendor, of the possession by which it may be protected.

The learned counsel for plaintiffs in error have urged that the special findings are inconsistent with the general verdict in favor of defendant in error; and that the court was in error in not rendering judgment in favor of plaintiffs in error upon the special findings, as required by the provisions of the Michigan statute. This statute makes it the duty of the court, on a request of counsel, to require the jury to return, in writing, special findings upon particular questions of fact submitted to them, and also provides that if such special findings be inconsistent with a general verdict, the former shall control the latter, and the court give judgment accordingly. 3 How. Ann. St. § 7606. The provisions of a statute of a state requiring the submission of such special questions to a jury are not binding upon the courts of the United States, and are not within the meaning and intent of the act of congress adopting the practice of the state courts in suits at common law tried in the United States courts. Nudd v. Borrow, 91 U. S. 441; Railroad Co. v. Horst, 93 U. S. 300; Association v. Barry, 131 U. S. 119, 9 Sup. Ct. 755. It would seem to follow that, if the court was not required by the statute to submit such special questions for a special finding, and did so only in the exercise of its general and inherent common-law powers, the effect of an inconsistent verdict would be a question to be determined by the common law and not by the state statute. Counsel have cited, in support of their assignment of error on this matter, the cases of Bond v. Dustin, 112 U. S. 604, 5 Sup. Ct. 296, and Glenn v. Sumner, 132 U. S. 156, 10 Sup. Ct. 41. Neither of these cases seems to be in point, as both turn upon the effect of pleadings under state practice, and involve the interpretation of verdicts as affected by pleadings conducted under local rules of practice. But the special findings do not cover all the issues in the case. The general verdict was in favor of the defendant in error, and must be presumed to have been based upon the failure of plaintiffs in error to establish other facts essential, as we have seen, to any recovery in an action of replevin. A judgment rendered on a special finding which does not find all the facts necessary to support a judgment is bad, and will be set aside. Hodges v. Easton, 106 U. S. 408, 1 Sup. Ct. 307. We think the court did right in ignoring these special findings, and in rendering judgment on the general verdict. The charge delivered by the learned district judge who tried this case was well considered and clear. The various requests made and refused, and the many exceptions to the charge, have all been carefully considered. To separately pass upon each error assigned would be unprofitable, and extend an opinion already too long to still greater proportions. We content ourselves by saying, in conclusion, that we are of opinion that the record presents no harmful error of which plaintiffs in error can complain, and the judgment is therefore affirmed.