---

In re O'NEIL et al.

(District Court, N. D. New York. September 11, 1911.)

1. BANKRUPTCY (§ 340*)—PROVABLE DEBTS.

Evidence *held* to sustain the finding of a referee that a note made by a bankrupt to his wife prior to his bankruptcy, indorsed by her and discounted at a bank, and which was taken up by him after the bankruptcy by the substitution of another similar note, was thereby paid and satisfied in accordance with the intention of the parties, and could not be proved by his wife against the bankrupt estate.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 340.*]

2. BILLS AND NOTES (§ 499*)—RENEWAL OF NOTE—PRESUMPTION OF PAYMENT OF OLD NOTE.

There is a presumption, when a note is renewed in due course at a bank by the note of the same maker and indorser, that the old note is paid, if taken up; but such presumption may be rebutted by facts and circumstances showing a different intent on the part of all the parties.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1695–1697; Dec. Dig. § 499.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In the matter of John G. O'Neil and Robert B. Doubleday, as individuals and as copartners in the firm of J. G. O'Neil & Co. On review of order of referee disallowing claim of Eloise C. Doubleday for $443.75 against the estate of Robert B. Doubleday, and also reducing another claim of said claimant from $108.21 to $61.20. Affirmed.

T. B. & I. M. Merchant, for trustee and creditors.

E. K. Clark, for claimant.

RAY, District Judge. The reduction of the claim of $108.21 to $61.20 is so clearly right that nothing further need be said.

[1] The correctness of the order disallowing the claim of Eloise C. Doubleday for $443.75 depends on whether or not the evidence in favor of the claim so clearly preponderates in favor of the claimant that the referee was not justified in finding the crucial fact against her. There was a conflict of evidence, and the referee might have found the other way. He heard and saw the witnesses, and so far as their credibility is concerned was better able to arrive at the truth than this court can be.

Prior to April 3, 1906, Robert B. Doubleday had made certain notes for small amounts payable to the order of Eloise C. Doubleday, which were discounted at the Binghamton Trust Company, Binghamton, N. Y. On that day these small notes were aggregated as to amount, and Robert B. made a note of $450.74, payable to the order of Eloise, due three months from date, and this was discounted by said trust company, and the small notes canceled and delivered to Robert B. July 3, 1906, this note was renewed at $429.29, $20 being paid, and the old note was surrendered to Robert B. October 3, 1906, this last note was renewed at $430.74, and the old note surrendered to Robert B. January 3, 1907, this note, was renewed at $437.19, and the old note surrendered to Robert B. April 3, 1907, this note was renewed, it is claimed, at $443.75, and the old note delivered to Robert B. July 3, 1907, this note was renewed, it is claimed, at $443.40 (due in three months), and the old note of $443.75 was delivered to Robert B. The differences in amount arose from small payments; the interest sometimes being paid, and sometimes added to the new note.

All of these new notes were payable to the order of, and indorsed by, Eloise C. Doubleday; and the trustee and creditors contend that the old notes were paid by the new ones and that such was the intent of the parties. The claimant, Eloise C. Doubleday, asserts that she in fact, by Robert B., paid the note of April 3, 1907, on July 3, 1907, and took same up, and became the owner of same, and has held the same as owner since, and that the note of July 3, 1907, was in effect a new and an independent transaction. October 19, 1907, the note of $443.40, dated July 3, 1907, past due, was in fact paid by the claimant. On that day she gave her individual note in payment thereof, secured by collateral. June 18, 1907, the firm of John G. O'Neil & Co. made a general assignment for the benefit of their creditors, and June 24, 1907, the petition in bankruptcy was filed, and followed by adjudica-

tion. The adjudication related back to the filing of the petition, and hence the note of July 3, 1907, is not provable in bankruptcy.

About July, 1908, the claimant procured from the Binghamton Trust Company an assignment to herself of the note of April 3, 1907, on which she bases her claim. In point of fact, July 3, 1907, the new note of $443.40, dated that day, made by Robert B. Doubleday, and indorsed by Eloise C. Doubleday, the claimant, took the place of the note of April 3, 1907, for $443.75, as the new note, or its proceeds, paid it to the trust company, if it was paid at all. The evidence from the officers of the trust company is that the note of April 3d was paid, so far as it was concerned, and absolutely surrendered by it to the maker. It is significant that nothing was said to the trust company by Doubleday that he was taking up the note of April 3d for his wife. The old note was surrendered by the trust company in exchange for the new one, as had been done before. Of course, the forms of discounting the new note and crediting the proceeds in payment of the old one were gone through with in due course of business. It is clear that the note of April 3d was paid and extinguished so far as the trust company was concerned.

The referee, in rejecting the claim of Eloise C. Doubleday on this note of April 3, 1907, for $443.75, in effect finds that same was paid July 3, 1907, by Robert B. Doubleday, who gave his note, indorsed by Eloise, or its proceeds, in exchange for same, and that such note did not pass to Eloise, or become her property, but was surrendered to Robert B., the maker, and that the trust company had no interest in it thereafter, and no right or power to assign it, and that in fact Robert B. Doubleday canceled it when he took it from the trust company by tearing a piece of his name therefrom, as had been and was his custom.

It stands to reason that the indorser of a note may furnish the maker, who is primarily liable for the payment thereof, the money (directly or indirectly) to pay such note for such indorser, and the maker may make the payment, take up the note from the bank where discounted, and hold it for the indorser or deliver it to him. In such case there can be no question that the note so paid would become the property of the indorser, and a valid claim against the maker in the hands of the indorser, although the bank from which it was taken and to whom it was paid by the maker for the indorser had no knowledge of the arrangement between the maker and the indorser. But such is not this transaction. The note, if paid at all, was paid by the maker with his note, or the proceeds of his note, indorsed by the claimant here. The trust company had it. It was its property, and paid to it by the maker, and it ceased to exist so far as the trust company was concerned, and it could not assert it as a claim against either maker or indorser. The officers of the trust company say as to it the note was paid. It follows that the trust company could not transfer it a year later, as it did not own it, or any interest in it, or the debt represented by it originally. If Eloise had paid it, and it was hers, why did she take an assignment of it a year later from the trust company?

It was, of course, possible for Robert B. and his wife, Eloise C.,

to make an arrangement by which the note of April 3d should be pur-
chased by Robert B. as agent for Eloise C., using his own note, in-
dorsed by her, to raise the money for the purchase. In such case
Eloise C. would become indebted to Robert B. in the amount of his
note, given by him and indorsed by her, to raise the money, and in
such case it would be her duty to pay such note. It would be for her
to pay—her debt. In view of the fact that bankruptcy proceedings
had been commenced June 24, 1907, is it probable that Mrs. Double-
day paid the note by that of her husband, indorsed by herself?

Under all the evidence and circumstances in the case, and in view
of all that occurred, I think the referee was fully justified in refusing
to find that Eloise purchased the note, or paid it, July 3, 1907, to the
trust company, by or through her husband. I think he was justified in
refusing to find that she ever became the owner of the note on which
her claim is based. If, July 3, 1907, after the general assignment and
the institution of the bankruptcy proceedings, Doubleday applied to
his wife, the claimant, to take up the note of April 3d, why did she not
make her own note, and pledge her stock as collateral, and substitute
it for the old note? If, July 3, 1907, Mrs. Doubleday told her hus-
band, the maker of the note, she wanted it kept alive, and that she
would buy it, and the new note was made by him and indorsed by her
for the purpose of being exchanged for the old note, or to be dis-
counted and the proceeds used to take up the old note of April 3d,
for Mrs. Doubleday, and was so used, and if this old note was taken
up in that way, and not canceled by the maker, but delivered to Mrs.
Doubleday, the claimant, her claim is good, and should be allowed.

But the referee has refused to find the facts that way, and as he
saw the witnesses and heard them I am not justified in reversing his
findings of fact. If the referee had found the arrangement or trans-
action between Mr. and Mrs. Doubleday when the note of April 3d
was paid to have been as I have stated, and as the claimant's counsel
contends it was, the legal effect would be plain enough, and it would
be immaterial what the intent or purpose of the trust company was
when it surrendered the note to Doubleday, or whether or not it was
informed of such arrangement. Renewal notes do not always pay the
note renewed—that is, taken up by the new note, which takes its place.
It is often a question of intention, to be determined from all the facts
and circumstances attending the transaction. If the maker, indorser,
and holder all expressly agree that the new note shall not operate as
a payment of the old one, there is no payment, and in such case the
holder would be at liberty to sell it, or deliver it to the indorser, on
receiving payment from him or her, or, if the indorser should pay it
subsequently, it would belong to him for enforcement against the
maker.

[2] There is a presumption, when a note is renewed in due course
at a bank by the note of the same maker and indorser, that the old note
is paid if taken up. This presumption is easily rebutted by facts and
circumstances showing a different intent on the part of all the parties.
See Matter of Utica National Brewing Co., 154 N. Y. 268, 272, 48 N.
E. 521, and cases cited; McElwee v. Metropolitan Lumber Co., 69

Fed. 302, 310, 16 C. C. A. 232. Of course, I am not to be understood as holding that Doubleday, even though bankruptcy proceedings had been commenced against him, could not make his note payable to the order of his wife, and lend it to his wife for the purpose of being used by her to raise money on her own account with which to pay the prior note of the husband indorsed by her; but under all the facts and circumstances of the case it seems improbable that any such thing actually occurred. If the wife wanted money, she should have made her own note, with the husband for indorser. If her obligation in any form was to take the place of that of the husband, and she was to become the owner of his note, she should have made her own note, with the husband as indorser.

I think the order of the referee, disallowing the claim, should be affirmed.