## WILLIS et al. v. GLENWOOD COTTON MILLS.

(District Court, D. South Carolina. November 23, 1912.)

**1. SALES (§ 289*)—SELLER'S LIEN—"STOPPAGE IN TRANSITU."**

The right of "stoppage in transitu" is an extension of the right to a lien for the price anterior to actual delivery, which lien the seller can enforce by seizing the goods in the possession of a carrier at any time prior to actual delivery into the possession of the buyer.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 824, 826; Dec. Dig. § 289.*

For other definitions, see Words and Phrases, vol. 7, pp. 6669–6672.]

**2. SALES (§ 302*)—PURCHASE PRICE—LIEN—WHAT LAW GOVERNS.**

Where contracts with reference to the sale of goods stored in mills.in South Carolina were made between parties in New York City, and the goods were never removed, the existence of a seller's lien on the goods for the price, whether created by the contracts of sale, or by statute, or general rules of law, must be determined by the law of South Carolina.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 858; Dec. Dig. § 302.*]

**3. SALES (§ 300*)—"SELLER'S LIEN"—EXISTENCE AND EXTENT.**

A "seller's lien" on chattels for the price exists at common law, without any express agreement, and is an implied part of every contract for the sale of personal property, being defined as the right to retain possession of the chattels until the price is paid, and continuing until delivery, unless divested by an agreement, express or implied, or is waived by a sale on credit, except when the purchaser becomes insolvent before payment, when the lien revives, provided the rights of bona fide third purchasers have not intervened.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 856, 860; Dec. Dig. § 300.*

For other definitions, see Words and Phrases, vol. 8, pp. 7288–7290.]

**4. SALES (§ 312*)—LIEN—BONA FIDE PURCHASERS—INTERVENING RIGHTS.**

Defendant sold certain cotton cloths to W., B. & Co., held subject to their order. They, on May 8, 1911, sold a large quantity of the cloth to W. G. & Co. for delivery in equal installments in September, October, November, and December, 1911. On October 19, 1911, W. G. & Co. were allowed to delay deliveries to be made in November and December for 60 days, in consideration of paying interest at 6 per cent., and during the period of extensions under such agreement they sold 52 bales to H. on terms of 10 days. On the same day H. resold the cloth to plaintiffs for cash. Before the expiration of the 10 days H., having become insolvent, did not pay W. G. & Co., who also failed to pay W., B. & Co., whereupon plaintiff sued defendants, who held the goods as bailees for the latter under a seller's lien to recover the cloth. *Held* that, the title

---

having legally passed to plaintiff, a bona fide purchaser for value, the seller's lien was lost.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 871, 876, 877; Dec. Dig. § 312.*]

At Law. Action by Grinnell Willis and others, doing business under the name of Grinnell Willis & Co., against the Glenwood Cotton Mills. Judgment for plaintiffs.

McCullough, Martin & Blythe, of Greenville, S. C., for plaintiffs.

Alfred Huger, of Charleston, S. C., H. J. Haynsworth, Cothran, Dean & Cothran, all of Greenville, S. C., and J. P. Carey, of Pickens, S. C., for intervening petitioners and defendants.

SMITH, District Judge. This cause came on for trial upon the pleadings and testimony. By stipulation in writing, duly signed and filed, all the parties to the cause agreed that the case should be heard and determined by the court without a jury. The facts are as follows:

The Glenwood Cotton Mills is a corporation engaged in the business of manufacturing cotton cloths, and is located and does business in the state of South Carolina. Prior to the date of the matters set up in the complaint herein the Glenwood Cotton Mills had sold to Woodward, Baldwin & Co., a copartnership carrying on business in the city and state of New York, the 52 bales of cotton cloths which have been seized under the process of the plaintiffs herein. These bales of cotton cloths, which had been sold by the Glenwood Cotton Mills to Woodward, Baldwin & Co., were the property of Woodward, Baldwin & Co., but were in the possession and held by the Glenwood Cotton Mills at its mill in the state of South Carolina as bailee of Woodward, Baldwin & Co., and subject to the order of Woodward, Baldwin & Co. On May 8, 1911, Woodward, Baldwin & Co. sold to Warner-Godfrey Company 690,000 yards of cotton cloths at the price of 6¼ cents per yard. Deliveries were to be made from the Glenwood Mills in equal installments in September, October, November, and December, 1911, in equal weekly quantities. Bills were to be made in duplicate and sent with bill of lading to Warner-Godfrey Company at their New York office. These deliveries were conditioned upon strikes, lockouts, etc., and were to be made "f. o. b. mills, N. Y. freight allowance." This was expressed in a written memorandum, whereby W. H. Hinchman & Co. "sold" for account of Woodward, Baldwin & Co. to Warner-Godfrey Company the goods under the terms mentioned. Warner-Godfrey Company is a New York corporation carrying on business in the city of New York.

On 19th October, 1911, at the request of Warner-Godfrey Company, Woodward, Baldwin & Co. agreed to delay the deliveries to be made in November and December for 60 days in consideration of the sellers being paid interest at the rate of 6 per cent. per annum. The sellers agreed to hold the goods at the mill insured; the bills to be sent in the regular way. The whole arrangement for delay was also made conditional on the Warner-Godfrey Company giving a check on re-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ccipt of each invoice covering the difference between the market price and 6¼ cents, "to-day's" price being 5½ cents. After this agreement had been made Woodward, Baldwin & Co. on the 6th, 13th, and 20th November, 1911, delivered to Warner-Godfrey Company four invoices. These invoices specified that the contract price for 12 bales was to be paid in 10 days from 15th November, 1911, for 15 bales in 10 days from 22d November, 1911, and for 25 bales in 10 days from 1st December, 1911. Each invoice also contained a memorandum under the head of "Terms" as follows: "Privilege of 60 + Int. @ 6% P. A.," which under the documentary and oral testimony meant that Warner-Godfrey Company was entitled to the privilege of an extension of 60 days from the due date of each invoice, paying interest at the rate of 6 per cent. per annum.

Warner-Godfrey Company in pursuance of the agreement paid the difference between the contract price of 6¼ cents and the market price on each invoice and secured an extension of time for payment of the amount specified in each invoice for 60 days from the due date of each invoice. As the maturity of the first invoice was 25th November, 1911, this extension carried the date of that payment to 24th January, 1912, and the others were all in like manner carried to a date subsequent to that. The goods remained in the actual physical possession of the Glenwood Cotton Mills. During the period of this extension, viz., on 4th December, 1911, the Warner-Godfrey Company sold these 52 bales (together with 10 others, making 62 bales) to W. H. Hinchman & Co. for 5¼ cents per yard, on terms of 10 days for payment and delivery "f. o. b. mill, N. Y. freight allowance." These terms were embodied also in a written invoice made out by Warner-Godfrey Company against W. H. Hinchman & Co. on 4th December, 1911, for these 62 bales, at a price aggregating $5,785.34, payable in "10 days net," and a memorandum at the foot, "Held for shipping instructions."

On the same day, 4th December, 1911, W. H. Hinchman & Co. resold these 62 bales to Grinnell Willis & Co., a copartnership carrying on business in the city of New York, for $5,717.94, which amount was on the same day paid in cash by Grinnell Willis & Co. to W. H. Hinchman & Co. W. H. Hinchman & Co., although paid in full for the goods by Grinnell Willis & Co., did not on the expiration of the 10 days, viz., on December 14, 1911, pay to the Warner-Godfrey Company the purchase price of the goods, but, on the contrary became insolvent, failed, and practically went out of business without making any payment for the goods. Warner-Godfrey Company have never paid Woodward, Baldwin & Co. for the goods, but the firm of Grinnell Willis & Co., who had paid W. H. Hinchman & Co., demanded delivery of the goods, and, that being refused, instituted these proceedings for the recovery of the possession of the goods from the Glenwood Cotton Mills. The Glenwood Cotton Mills have answered, setting up the sale by them of the goods to Woodward, Baldwin & Co., and stating that it is only the bailee of these goods, which it holds as the bailee either of Woodward, Baldwin & Co., or of Warner-Godfrey Company, and that, the purchase price of the goods never

having been paid to Woodward, Baldwin & Co., the defendant the Glenwood Cotton Mills, as the bailee and agent of Woodward, Baldwin & Co., in whose possession the goods are, is entitled to retain possession of the goods until the purchase price thereof shall have been paid.

The practical condition of affairs is that Grinnell Willis & Co. have actually paid $5,717.94, which they stand to lose unless they can recover the goods for which they paid that price. If Grinnell Willis & Co. recover the goods in controversy, then the Warner-Godfrey Company stands to lose the $5,785.34 for which it sold the goods to W. H. Hinchman & Co.; this last firm being insolvent. In like manner, if Grinnell Willis & Co. recover the goods, then Woodward, Baldwin & Co. lose the contract price for which they sold to the Warner-Godfrey Company, unless they can recover the price from the Warner-Godfrey Company. There is no charge or evidence of fraud or collusion between W. H. Hinchman & Co. and Grinnell Willis & Co., and all parties stand upon their strict rights. There is no charge or evidence that the Warner-Godfrey Company is not perfectly solvent and able to respond to its liabilities. The question in the case under these facts depends mainly upon the rights of Woodward, Baldwin & Co. and the Warner-Godfrey Company as sellers of these goods, who have not been paid the purchase price. Woodward, Baldwin & Co. sold the goods to Warner-Godfrey Company upon terms payable 60 days after the 25th November, 1911, and the later dates, respectively; that is to say, the time within which Warner-Godfrey Company could make payment for these goods did not expire as to any part thereof until the 24th January, 1912. During that interval the goods belonged to the Warner-Godfrey Company, and it had a right to sell them or treat them as their own goods, making payment on or at any time anterior to the 24th January, 1912.

Warner-Godfrey Company thereupon sold the goods to Hinchman & Co. on a credit of 10 days, which would expire on the 14th day of December, 1911, so that the goods then were sold to Hinchman & Co. and were the property of Hinchman & Co., to be paid for by them on or before the 14th day of December, 1911. Hinchman & Co. immediately sold the goods to the plaintiffs, Grinnell Willis & Co., who immediately paid Hinchman & Co. in full for them. There is no doubt that under the terms of the written contracts the Warner-Godfrey Company could at any time anterior to the date of their extended payment, viz., 24th January, 1912, have required the Glenwood Cotton Mills to deliver to them or to their order these bales of cotton goods. Such being the case, there is no doubt but that Hinchman & Co. had a right under the written contracts at any time on or subsequent to 4th December, 1911, and prior to the 14th December, 1911, to order the Glenwood Cotton Mills to deliver these goods to them or their order. If Hinchman & Co. possessed this right, it would seem that their right passed to the plaintiffs, Grinnell Willis & Co. when they bought from Hinchman & Co. The defendant the Glenwood Cotton Mills, however, as the agent and bailee for Wood-

ward, Baldwin & Co., or say Warner-Godfrey Company, sets up the claim that in all these contracts there entered into the contract as a part of it, so placed in it by the law, the provision of law that there is what is known as the seller's lien for the payment of the purchase. money, which exists even in the case of a sale on time, if the insolvency of the purchaser intervenes anterior to the actual delivery of the goods; that is to say, the contention is that it is a rule of law in the sales of personal chattels that although a positive sale of chattels be made for a price payable at a future date, yet if at any time anterior to actual delivery the purchaser shall become insolvent a lien attaches by virtue of or consequent upon such insolvency in favor of the seller as a seller's lien, by which he is not bound to deliver the goods unless the purchase price is paid.

[1] The extension of this doctrine constitutes what is known as the right of stoppage in transitu, whereby the seller can enforce this lien by seizing the goods in the possession of the common carrier at any time anterior to the actual delivery into the possession of the purchaser. There is no doubt that Woodward, Baldwin & Co. have never been paid the purchase price of these goods. There is equally no doubt that under the terms of the written instruments they sold these goods absolutely to Warner-Godfrey Company, with the right or privilege to Warner-Godfrey Company to take possession of the goods, although the time of payment was deferred until the 24th January, 1912. There is no evidence that Warner-Godfrey Company are insolvent. In like manner there is no doubt upon the written instruments that Warner-Godfrey Company sold these goods to Hinchman & Co. on the 4th December, 1911, with the right or privilege to Hinchman & Co. to take possession of the goods, although the time of payment was deferred until 14th December, 1911. Whatever rights Hinchman & Co. had, they parted with on the 4th December for full value to Grinnell Willis & Co., and the question is whether any seller's lien exists in this case in favor of Woodward, Baldwin & Co., or Warner-Godfrey Company, as against Grinnell Willis & Co., being purchasers in good faith for full value of chattels which appeared by the written contracts to belong to Hinchman & Co., although Hinchman & Co. had not paid the purchase money, not being bound to pay it until the 14th December, 1911.

[2] The contracts in question were all made in New York, and between parties at the time in the city of New York; but the actual chattels, the physical property, were at the time of the making of the contracts and still are in the state of South Carolina, and it is therefore now held as a conclusion of law that the existence of a lien on the chattels, whether created by the terms of the contracts, or by statute, or by general rules of law, must be determined by the lex rei situs; i. e., by the law of the state of South Carolina.

[3] The seller's lien on a sale of chattels exists at common law without any express agreement, and is impliedly a part of every contract of sale of personal property. It may be defined as the right on the part of the seller to retain possession of the chattels sold until the price is paid. This right continues until delivery of the goods to

the purchaser, unless it is divested by any agreement express or implied. It is divested or waived where the sale, although absolute, is on credit to be paid at a fixed future date. Even in this case, however, if the goods have not been actually delivered to the purchaser, and the purchaser becomes insolvent before payment, the lien or right is revived. It exists or revives, as between seller and purchaser, unless actual or constructive delivery has been made to the purchaser. Although the goods have been delivered to a carrier for transportation, consigned to the purchaser, yet if the purchaser becomes insolvent prior to the delivery to him by the carrier, the right or lien of the seller revives, and can be exercised under the rule of law known as stoppage in transitu; the right of stoppage in transitu being an equitable extension of the principle of the seller's lien for unpaid purchase money.

Upon a sale of chattels, the seller has the right to retain possession until the purchase price has been paid. If he has parted with the possession, so far as to deliver the chattels to a carrier, consigned to the purchaser, he has still the right to withhold or reacquire possession upon the purchaser's insolvency prior to the carrier's delivery to him. This right is waived by an absolute sale, coupled with an extension of the time of payment for a definite fixed period, but, although waived, revives upon the purchaser's insolvency prior to delivery to him, provided the right of innocent bona fide third purchasers may not have intervened.

[4] Under the written documentary contracts put in evidence in this case, the court holds that the contract between Woodward, Baldwin & Co. and Warner-Godfrey Company was an absolute sale of the goods in question, with the agreement that the purchase price should be paid at a deferred extended period, which did not expire as to any part of it until on or before the 24th January, 1912. During that period, as between Woodward, Baldwin & Co. and Warner-Godfrey Company, Warner-Godfrey Company was the owner of the property, and had the right to order it shipped out upon sales of its own at any time made. In other words, under the contract Warner-Godfrey Company could have on the 16th day of November, 1911, directed the shipment to itself, or to any person designated by it, of all these goods without payment of the purchase price, which it was not bound to pay until on or before the 24th of January, 1912. There was, however, by virtue of the rule of law before alluded to, incorporated in this absolute contract the provision that, if Warner-Godfrey Company should become insolvent at any time before it actually did direct the shipment of these goods and have shipment made, Woodward, Baldwin & Co. would have the right by virtue of the implied seller's lien or right of possession to retain possession until the purchase price was paid.

The first question is, however: Would this right, which in that interval Woodward, Baldwin & Co. had as against Warner-Godfrey Company, exist as against an innocent purchaser for value from Warner-Godfrey Company? To state the question: Suppose Warner-Godfrey Company had on the 30th November, 1911, exhibited to a

third party this contract of absolute sale, showing their right to immediate delivery of the goods, and then sold the goods to such third party, who in good faith and at once paid Warner-Godfrey Company in full for the goods; then suppose that, before this third party succeeded in getting possession of the goods, Warner-Godfrey Company had become insolvent: Was this principle of law referred to under the head of the seller's lien so incorporated in the contract between Woodward, Baldwin & Co. and Warner-Godfrey Company that this third party, who was a purchaser for value, must be presumed to have purchased and paid the purchase money to Warner-Godfrey Company with notice that, unless the purchase money was actually paid to Woodward, Baldwin & Co., the purchaser would not have the right to take possession of the goods, should Warner-Godfrey Company thereafter and before delivery of possession become insolvent? Or would such innocent third purchaser have the right to rely upon the express written contract of sale, showing that a sale absolute had been made to Warner-Godfrey Company, who thereby had title and was entitled to the possession of the goods, and who were not bound to pay for them until the lapse of some two months, and who were at the time of the sale to such third party still solvent?

The first stated presumption would have required that any intending purchaser from Warner-Godfrey Company would have been charged with the burden, when he purchased, of either seeing that the purchase money was actually paid to Woodward, Baldwin & Co., with whom he had no connection, and of whom he may have had no other knowledge, or of otherwise being put in the position of guaranteeing the continued solvency of Warner-Godfrey Company. The federal courts, following the general rule, have held that where the rights of third parties have attached, as in the case of bills of lading duly transferred, the seller's lien or right of stoppage in transitu does not exist. Schmidt v. The Pennsylvania (C. C.) 4 Fed. 548; St. Paul, etc., Co. v. Great Western Dispatch Co. (C. C.) 27 Fed. 434; Sheppard v. Newhall, 54 Fed. 306, 4 C. C. A. 352. The reason of the general commercial rule applicable in the case of the transfer of title by indorsement of bills of lading would appear to apply equally where the title is transferred to an innocent purchaser for value by virtue of the power and right derived from any other written document. McElwee v. Metropolitan Lumber Co., 69 Fed. 302, 16 C. C. A. 232.

After a careful consideration of the principles and rule under the authorities, the court has arrived at the conclusion that, although this seller's lien exists between seller and purchaser, it does not exist, or rather it is not revived, to the detriment of innocent third purchasers for value, who purchased while the original purchaser was still solvent; that is, that if Warner-Godfrey Company had sold these goods to a bona fide purchaser for value, being still solvent at the time of such sale, their subsequent insolvency would not deprive the third party of its right to acquire and take possession of the goods. If such be true as to Warner-Godfrey Company, it is equally true as to the subsequent sale from Warner-Godfrey Company to Hinchman

& Co.; and if it be true as to the sale between Warner-Godfrey Company and Hinchman & Co., it is equally true as to the subsequent sale from Hinchman & Co. to the plaintiffs, Grinnell Willis & Co. The purchase price of the goods has been paid. The testimony is that Grinnell Willis & Co. did actually and in good faith pay the purchase price of the goods to Hinchman & Co. It has not reached the original owner, viz., Woodward, Baldwin & Co.; but it has been paid, and from the testimony it does not appear that at the time Grinnell Willis & Co. made the payment that Hinchman & Co. were insolvent.

The original sellers, Woodward, Baldwin & Co., have the right to sue the immediate purchaser from them, Warner-Godfrey Company, upon their contract for the contract price; and, it not appearing that Warner-Godfrey Company is insolvent, the right to exercise and enforce the seller's lien would seem very questionable under the circumstances, so far as Woodward, Baldwin & Co. are concerned.

It further appears from a petition for leave to intervene, filed in the cause by Warner-Godfrey Company, that it claims to have canceled and terminated the original agreement of sale made on the 8th May, 1911, with Woodward, Baldwin & Co., and that Warner-Godfrey Company, following such cancellation, have instituted an action in the Supreme Court of the state of New York for the county of New York against Woodward, Baldwin & Co. to recover back all moneys paid by the Warner-Godfrey Company to Woodward, Baldwin & Co. on account of the purchase price of the Glenwood cotton sheetings purchased under the agreement of 8th May, 1911. So that it would appear that Warner-Godfrey Company have disclaimed to stand in the position of purchasers and owners of the cotton sheetings, and it would seem to follow that they could not be subsequent sellers and claim a seller's lien.

Without, however, resting the conclusion reached on these subordinate points, the court holds as matter of law that no ground appears that would justify the assertion of a seller's lien against Grinnell Willis & Co., standing as they do in the position of innocent third purchasers for value without notice of anything save that Hinchman & Co. were the owners of the goods, for which they were not bound to pay until 14th December, 1911, 10 days subsequent to the purchase by Grinnell Willis & Co.

Under the circumstances of this case the court holds the plaintiffs, Grinnell Willis & Co., entitled to recover from the defendant Glenwood Cotton Mills the 52 bales of cotton goods in dispute, and a formal judgment to that effect will be entered.