## In re J. F. GROWE CONST. CO.

(District Court, N. D. New York. March 31, 1919.)

1. SALES ⬤⟶101—RESCISSION BY SELLER—ELECTION—KNOWLEDGE OF FACTS.
   One who was induced by fraud to sell goods to an insolvent corporation does not lose his right to rescind for the fraud by filing notice of lien before he had knowledge of the fraud, though the filing of such notice with knowledge of the facts would be a binding election.

2. BANKRUPTCY ⬤⟶140(2)—TITLE OF TRUSTEE—GOODS FRAUDULENTLY BOUGHT.
   A trustee in bankruptcy acquires no greater rights than the bankrupt himself had to goods purchased by the bankrupt through fraudulent representations as to solvency, where there has been no conveyance or incumbrance of the property void against the trustee by some positive provision of the Bankruptcy Act.

3. SALES ⬤⟶201(4)—DELIVERY—POSSESSION BY CARRIER.
   Where goods sold were shipped by rail to the buyer and held by the carrier at their destination for payment of transportation charges by the buyer, there was no delivery to the buyer, and the title never passed to it.

4. SALES ⬤⟶100—REMEDIES OF SELLER—ANTICIPATORY BREACH.
   The bankruptcy of the buyer, whether voluntary or involuntary, is an anticipatory breach of an executory contract of sale, which justifies the seller in rescinding.

5. SALES ⬤⟶96—RESCISSION BY SELLER—FRAUD—MATERIALITY.
   False statements as to the buyer's insolvency, made to seller's agent while the goods were in a carrier's possession at their destination waiting delivery to buyer, relied on by the seller, so that he lost his right of stoppage in transit, were material, and authorized a rescission by the seller.

6. SALES ⬤⟶296—STOPPAGE IN TRANSIT—"TRANSIT."
   "Transit" includes, not only carriage of goods to destination, but delivery there according to the terms of the contract, so that neither arrival of the goods at destination nor seizure on attachment by a creditor of consignee terminates the right of stoppage in transit.

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. SALES ⬡⇒111—RIGHTS OF SELLER—RESCISSION—SALE OF MATERIAL FOR BUILDING.

> One who sold steel to a contractor for incorporation into a building, after rescission for fraud of the buyer, is entitled to the property as against the owner of the building, who had taken possession thereof to complete his building after breach by the contractor; the agreement between the contractor and owner not being recorded or filed, so as to become effective as a chattel mortgage.

In Bankruptcy. Involuntary proceedings against the J. F. Growe Construction Company. On application for confirmation of the report of Edwin A. King, as special master, finding that claimant, the Truscon Steel Company, formerly the Trussed Concrete Steel Company, was entitled to certain property as against both the trustee in bankruptcy and William C. Vrooman, adverse claimant. Report confirmed.

See, also, 253 Fed. 981.

Geo. J. Hatt, 2d, of Albany, N. Y., for trustee.

Thos. R. Tillott, of Schenectady, N. Y. (Chas. A. Riegelman, of New York City, of counsel), for claimant Truscon Steel Co.

Miller & Golden, of Schenectady, N. Y., for claimant Vrooman.

RAY, District Judge. The J. F. Growe Construction Company, here called Construction Company for brevity, entered into a written contract with William C. Vrooman, owner of certain real estate in the city of Schenectady, on the 17th day of February, 1917, to "provide all the materials and perform all the work for the erection and completion of a two and one story commercial building to be located at 247 Dock street, Schenectady, N. Y." The said contract contained the following provisions, viz.:

> "Should the contractor at any time refuse or neglect to supply a sufficiency of properly skilled workmen, or of materials of the proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, such refusal, neglect, or failure being certified by the architects, the owner shall be at liberty, after three days' written notice to the contractor, to provide any such labor or materials, and to deduct the cost thereof from any money then due or thereafter to become due to the contractor under this contract; and if the architects shall certify that such refusal, neglect, or failure is sufficient ground for such action, the owner shall also be at liberty to terminate the employment of the contractor for the said work and to enter upon the premises and take possession, for the purpose of completing the work included under this contract, of all materials, tools, and appliances thereon, and to employ any other person or persons to finish the work, and to provide the materials therefor, and in case of such discontinuance of the employment of the contractor —— shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the owner in finishing the work, such excess shall be paid by the owner to the contractor; but if such expense shall exceed such unpaid balance, the contractor shall pay the difference to the owner. The expense incurred by the owner as herein provided, either for furnishing materials or for finishing the work, and any damage incurred through such default shall be audited and certified by the architects, whose certificate thereof shall be conclusive upon the parties."

---

⬡⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Also the following:

"Under this contract the owner has the privilege to occupy part or parts of the building as soon as such is or are ready for occupancy."

The said Construction Company entered on the performance of such contract, taking possession of the premises for the purpose, and February 17, 1917, entered into a contract with Trussed Concrete Steel Company, of Youngstown, Ohio, now Truscon Steel Company, and hereafter called Steel Company for brevity, by which said Steel Company was to furnish for use in the construction of such buildings certain steel Kahn bars, rib bars, Floretyle, Hy-Rib and round rods, f. o. b. cars at its works, Youngstown, Ohio, freight allowed to Schenectady, N. Y., at the agreed price of $2,025, "net cash 30 days from date of such invoice or 1 per cent. for cash 15 days after deducting freight."

The Steel Company shipped the steel to the Construction Company in two lots, one March 21, 1917, and the other March 23, 1917, over the New York Central Railroad lines, consigned to J. F. Growe Construction Company, at Schenectady, N. Y., as per agreement.

One shipment, that of March 23d, reached Schenectady April 2d, and was unloaded and placed on the premises where such buildings were being erected April 3 or 4, 1917; the other shipment, that of March 21st, reached Schenectady April 9th, but was not placed on such premises, but was unloaded by the railroad and placed in its freight house, under its rule that part of a carload of freight shall be unloaded at the freight house, regardless of shipping directions to the contrary.

The carload last shipped, but first to arrive at Schenectady, was invoiced at $1,445.34, and the part of a carload first shipped, and received at Schenectady April 9th, invoiced at $579.66. When this contract was made between the Steel Company and the Construction Company, the latter was actually insolvent and knew the fact, but the Steel Company was ignorant of such fact, as was Vrooman.

In 1915 the Construction Company, through the Bradstreet and Dun commercial agencies, had communicated to the trade generally, or put in the way of being communicated to the trade, or all who should inquire, materially false and untrue statements and representations as to its financial condition and ability, representing its total assets as $36,671.74 and its total liabilities as $7,846.35. Before entering into the contract the Steel Company procured from the said commercial agencies reports as to the financial condition of the Construction Company, which, based on such financial statements made by the Construction Company and subsequent information, showed its assets as $38,671.74 and its liabilities as $30,825.39.

The agent of the Steel Company testified that in originally making the contract of sale of this steel he relied wholly on these reports. It is undoubtedly true that he did. In fact, the Construction Company was insolvent then and at all subsequent dates, and knew it.

Shortly before April 2, 1917, Smith, the duly authorized agent of the Steel Company, learned that a lien had been placed on some of the

property of the Construction Company. He made an unsuccessful search for Growe, of the Construction Company, and, being unable to find him, he went to Mr. Shaffer, who was the treasurer of the Construction Company, for information as to its financial condition, when the following conversation took place:

"A. I went to the office of the Growe Construction Company in Albany. I asked for Mr. Growe, and I was told that he was not there, but that the treasurer, Mr. Shaffer, was there. I had a talk with Mr. Shaffer. I asked him what there was to the lien that had been filed against the property in Albany on which the Growe Construction Company were doing the work. He said that that lien meant absolutely nothing; that it was merely a petty misunderstanding between Mr. Crannell and Mr. Growe; that Mr. Crannell and Mr. Growe had between themselves, verbally agreed upon the settlement of it, which Mr. Crannell afterwards put into a letter and sent to Mr. Growe, asking Mr. Growe to verify their understanding by signing it; that Mr. Growe had been too busy to take it up, or overlooked sending it back to Mr. Crannell; and that Mr. Crannell had filed this lien, or caused this lien to be filed. I said: 'I want to know what effect that has on the company.' 'Why,' he said, 'that has no effect on the company.' I said: 'I am here as the Credit Department, because we have got some goods on the way here to you, and I want to know about that lien.' He said: 'I know; the goods are there in the freight sheds.'

"Q. Had the goods been delivered at that time?

"Mr. Hatt: I object to that as calling for a conclusion."

(Sustained. Exception.)

"Q. Did Mr. Shaffer say whether or not they had received the goods which you had shipped to them?

"Mr. Hatt: I object to that as improper. He has testified that Shaffer told him that the goods were at the freight house."

(Overruled. Exception.)

"A. He specifically said the goods were still at the freight house, and I called his attention to the part of our contract, as a reason for my being there—

"Mr. Hatt: I object to that as improper and move to strike it out."

(Overruled. Denied.)

"Q. State anything you said, Mr. Smith, or he to you, on the subject of this shipment or their credit. A. When he said that the lien had no effect upon the company, I said that I wanted to know its bearing upon the company, because we had some goods on the way that if there was trouble, I could stop in the delivery, and he answered not to do that; that they had had trouble enough with the strike, and their goods were a couple of weeks late in getting here anyway. Then he went on to tell about the strike; that the workmen had asked for more money, and he had refused to grant it, but that he was going over the next day, and he was quite confident he could compromise with them and get them back on the job at once. But I kept at him on the effect on the company of the lien.

"Mr. Hatt: I move to strike that out as improper."

(Granted.)

"Mr. Riegelman: I consent to it.

"Q. State what you said and he said about anything that took place, but not the effect. A. I asked him, 'How about the payment of our account?' and he said, 'Don't you worry about the account. The company is financially responsible. We have property. We have money to take care of your bill when it is due, or within a very few days, and the strike is the reason, if there is any delay.'

"Q. Did you do anything at that time to stop the delivery of the goods? A. No, sir."

This conversation and the statements then made must be considered in connection with the information before received by Smith from the

commercial agencies and which had been communicated to them by the Construction Company. The Construction Company was then insolvent, and it and its officers, including the treasurer, knew that fact. The Steel Company, represented by Mr. Smith, relied on the statements made by its treasurer, sustained, as he believed they were, by the prior representations obtained through the commercial agencies, and took no steps to protect its rights with respect to such property, believing the Construction Company was solvent and that the steel would be paid for as the bills came due, and that the Construction Company had the financial ability to pay. The steel was then en route to Schenectady, and if the truth had been told by the treasurer to Mr. Smith it could have been stopped, and would have been stopped in transit before reaching the premises of Vrooman as to the one shipment, or the freighthouse of the railroad company as to the other shipment. April 11, 1917, Vrooman served the following notice on a bookkeeper of the Construction Company, but it is not shown that such bookkeeper was authorized to receive same, or that it ever came to the notice or knowledge of any officer of the Construction Company. Such notice was as follows:

"J. F. Growe Construction Co., Albany, N. Y.: You are hereby informed, that I, the owner of the property designated as 247 Dock street, Schenectady, N. Y., do hereby give you notice to continue work and resume same, for which work you are under contract with me, and which contract is dated February 17, 1917. You are further informed that according to the terms of said contract, as set forth in article V of that instrument, I shall terminate your employment, shall enter and take possession of the premises, for the purpose of completing the work included under this contract, of all materials, tools, and appliances thereon, and shall employ any other person or persons to finish the work and furnish materials therefor, at your expense, unless you proceed with such work within three days from this date.

"[Signed]   Wm. C. Vrooman.
"April 11, 1917, Schnectady, N. Y."

April 14th Vrooman took possession of the property placed on such premises by the said Construction Company, including the steel received from the Steel Company that had been placed there. On the same day, April 14th, a creditor, through Miller & Golden, attorneys, who also represented Vrooman, brought suit against the Construction Company, and in such suit attached the steel in the railroad freight house. The freight charges were not paid, but the agent of the railroad company was notified of the attachment and such steel was segregated.

On the same day, April 14th, a petition in bankruptcy against the Construction Company and an application for the appointment of a receiver of its property were duly executed, and on the 16th of April presented to and filed with the clerk of the United States District Court, Northern District of New York, and on the same day B. J. Savage, of Albany, N. Y., was duly appointed receiver of the property by the District Judge, and on the same day he duly qualified and took possession of the property of the alleged bankrupt situated at Albany, N. Y. He made an inventory April 18th, and an appraisal, and claimed and demanded all of such steel.

April 14th, Mr. Smith, the said agent of the Steel Company, learned that the Construction Company was in financial difficulties, and directed Mr. Tillott, an attorney, to file a mechanic's lien on all such steel, which he did on the 16th of April, but after such receiver was appointed. The order appointing the receiver authorized him to take possession of all property of the alleged bankrupt, and contained the usual injunction clause against all suits and interference with its property. The attachment suit went to judgment April 20th, and a sale was advertised, but not made; but I do not see as that is material, as no one claims title under or through that suit, and the attachment clearly was vacated by the bankruptcy proceedings, in which adjudication followed in due course.

The Steel Company had no knowledge of the insolvency of the Construction Company until after the petition in bankruptcy was filed. It had some information which put it on inquiry, and it applied for information to the officer of the company who should have known, and who did know, and who made to it false and misleading statements and representations, upon which it relied, and because of which, as stated, it failed to act for the protection of its rights and stop the steel in transit. March 30th, on a certificate of work done, Mr. Vrooman paid the Construction Company, now bankrupt, the sum of $1,581, the amount due from him on the contract at that time. This did not include any estimate or payment on account of any of this steel. It had not then been received at or on the premises. The railroad company notified the Construction Company of the arrival of the steel at its freight house, which was unloaded there; but that company did not pay the freight or charges or take it away. April 18th the Steel Company filed a second notice of lien, and on April 23d a third notice of lien, on this steel. April 25th the Steel Company notified the railroad company of its election to stop in transit all the steel shipped by it to the Construction Company, tendered payment of all transportation and other charges thereon, and demanded delivery of same, which the railroad company refused. The attachment suit and proposed sale thereunder was subsequently abandoned. April 28th the Steel Company commenced a replevin suit against the railroad company and its agent, paid the charges and demurrage, and obtained possession of the steel at the freight house.

On or about May 2d the Steel Company, through Mr. Smith, its credit agent, who had been making inquiry, obtained further information as to the situation and information as to the insolvency of the Construction Company, and May 4th served on Vrooman, and May 5th on the receiver, due notice of claim of title to all of such steel. The Construction Company had ceased work on the contract as early as April 11th or 12th.

May 5th the Construction Company was duly adjudicated a bankrupt on the petition filed April 16th, and in due course Mr. B. J. Savage, the receiver, was appointed trustee and duly qualified. The replevin action was then discontinued, and the steel seized in that action by agreement was stored in the name of the receiver, where it now remains, subject to adjudication as to ownership. In the meantime, with-

out prejudice to the rights of the parties or claims of ownership, Mr. Vrooman had been permitted to use the steel placed on his premises in the construction of his building.

A stipulation in writing was entered into by Vrooman, the Steel Company, and the trustee as follows:

"Whereas, a petition in involuntary bankruptcy was filed herein April 16, 1917, and on the same day order was duly made appointing B. Jermain Savage receiver herein, who on the same day duly qualified as such; and whereas, Trussed Concrete Steel Company, of Youngstown, Ohio, had made two shipments to said J. F. Growe Construction Company of steel bars, metal lath, hy-ribs, floretyle, and the like, for use in a certain contract between said J. F. Growe Construction Company and William C. Vrooman for the construction of a building on Dock street, in the city of Schenectady; and whereas, at the date of the appointment of a receiver aforesaid one of said shipments had been delivered on said job, and the other of said shipments was contained in the freight house of the New York Central Railroad Company at Schenectady, New York; and whereas, said Vrooman claims title to the aforesaid material delivered on the job; and whereas, said Trussed Concrete Steel Company claims title to all of the aforesaid material; and whereas, the receiver, pursuant to the terms of the order appointing him receiver, has asserted and claims title to the aforesaid property; and whereas, it is in the interest of all parties that the question of the ownership and right to possession of said property should be speedily determined:

"Now, therefore, said Trussed Concrete Steel Company, by Thomas R. Tillott, its attorney, said William C. Vrooman, by Arthur S. Golden, Esq., his attorney, and said receiver, by George J. Hatt, 2d, his attorney, hereby stipulate that an order of reference may be obtained forthwith, without further notice, referring it to Edwin A. King, Esq., referee in bankruptcy, as special master, or such other special master as the court may appoint, to hear the testimony of the parties hereto and of any witnesses that may be called before said special master, and determine the question of the ownership and right of possession to all of the aforesaid material so shipped by said Trussed Concrete Steel Company to the bankrupt, reserving all rights to review and appeal from decision of said special master to all higher federal courts and judges, and that property be held to await the decision of appeal, if any be taken.

"Dated May 9, 1917.

T. R. Tillott,

"Attorney for Trussed Concrete Steel Company.

"Arthur S. Golden,

"Attorney for William C. Vrooman.

"George J. Hatt, 2d,

"Attorney for Receiver."

Mr. Vrooman claims, first, as to the steel delivered on his premises, that under his contract with the Construction Company he had the right to take possession of such steel on his premises as against it and as against the Steel Company, and hold same, and that he had and has an equitable lien thereon in any event, as he took possession of same prior to the filing of the petition in bankruptcy. His contract was not filed as a chattel mortgage, and there was never any delivery to Vrooman, and the property was not in existence when the contract was made. It was after-acquired property. As to the steel delivered on Vrooman's premises, the trustee claims it was sold under a valid contract of sale, and shipped and delivered to the Construction Company; that on adjudication and his appointment as trustee the title vested in him as of the date of filing the petition or adjudication, at least,

and that Vrooman has no title or claim superior to his; and also that there were no fraudulent representations or statements which justified a rescission of the sale, and that, had there been in the first instance, the sale was not rescinded for fraud, but that the Steel Company elected one of two remedies, that of filing a lien, thereby recognizing title in the Construction Company, and must pursue that remedy or none.

The Steel Company claims that it was induced to enter into the contract of sale by fraudulent representations; that it had the right of stoppage in transit; that it was induced by fraud and fraudulent representations and concealment of the truth to forego the pursuit and enforcement of such remedy at that time, and that on discovering the facts it had the right to rescind the contract for fraud and reclaim the property and that it could have done this against the Construction Company, and would have done so in the first instance but for the misrepresentations made about April 2d, and that the trustee has no greater rights than the Construction Company had; also that on learning all the facts, which it was diligent in doing, it had the right to abandon its liens, or notices of liens, and pursue its true remedy, justified by the facts which subsequently came to its knowledge, and rescind the contract of sale for fraud. As to the steel unloaded at the freight office the Steel Company makes the same claim of fraud and that it had the right of stoppage in transit and exercised the right while the steel was in transit, it never having reached or been delivered to the Construction Company.

The trustee in bankruptcy claims, first, there was no fraud which would justify such action, and, second, that the steel was in legal effect delivered when put in the freight house, and title then passed, and, third, that the Steel Company had and has elected another remedy, that of lien filed, thereby recognizing title in the Construction Company, and must abide by such election.

[1] First. When a party has two remedies, one being inconsistent with the other, and he knows all the material facts and elects to pursue one of such remedies, he cannot afterwards turn around and pursue the other; but an election made in ignorance of material facts does not bind and preclude the party from abandoning the one and pursuing the other. Dickson v. Patterson, 160 U. S. 584, 591, 592, 16 Sup. Ct. 373, 40 L. Ed. 543; Hays v. Midas, 104 N. Y. 602, 11 N. E. 141; E. C. Foundry Co. v. Hersee, 103 N. Y. 25, 9 N. E. 487; 15 Cyc. 261, and cases there cited.

If a contract to sell and deliver property is induced by materially fraudulent representations, the seller, on discovery of the fraud, has the right to rescind and refuse to perform further, and even reclaim the property already delivered. He may waive the fraud, of course, and sue on contract for the purchase price, or pursue any of the ordinary remedies, and thereby treat the sale as valid and as having passed the title. But if he acts in ignorance of the facts, and acts promptly on discovery thereof, he has not lost his right to rescind, even if he had instituted other proceedings on the assumption the contract was valid and free from fraud. See cases cited.

In Dickson v. Patterson, supra, Mr. Justice Harlan delivered the opinion of the court and said:

"But there are other considerations which preclude Patterson from insisting that Dickson made his election of remedies, and must abide by that election. During the correspondence that took place between the parties in 1886, Dickson, so far as the record shows, was not aware that the sale and conveyance to Boehme was merely fictitious, and in execution of Patterson's scheme to defraud him. Patterson assured him that that sale was a real one, and there is no proof to show that Dickson, at the time, knew or believed anything to the contrary. If it was a real sale, Dickson, having joined in the deed to Boehme, could not go behind it, unless he could show that the latter did not purchase in good faith. But, from what Patterson wrote to him, he had no reason to doubt the validity of the sale to Boehme. Besides, Patterson induced Boehme to inform Dickson by letter that the amount paid was only $6,000, and that it was changed in the deed to $10,000 at his (Boehme's) request, and that Patterson was an honest man, with a good reputation. All this was well calculated to make the impression upon Dickson that the only relief he could have against Patterson was to obtain an accounting, and a decree or judgment for such additional sum as was justly due him.

"After the correspondence between the parties ended in the latter part of the year 1886, the plaintiff, as we must assume from the record, ascertained for the first time all the facts as they are now disclosed, and, without unreasonable delay, commenced the present suit. We should not be justified by the record in saying that he had, for any considerable time before the bringing of this suit, such knowledge of all the circumstances of this transaction as enabled him to know with certainty what his rights were, and to determine what course should be taken to vindicate them. If, as the evidence shows, the real facts were concealed from him by one from whom he had reason to expect a frank disclosure of all the material circumstances as they occurred, he is not, for that reason—no rights of innocent third parties having intervened—to be denied the fullest relief to which according to the principles of equity he is entitled."

In E. C. Foundry Co. v. Hersee, supra, the Court of Appeals of New York held:

"The mere bringing of an action for the price of goods sold   *   *   *   is not a binding election of remedies, or a waiver of right to rescind the sale on the ground of fraud," unless the action was brought with knowledge of the fraud.

In Hays v. Midas, supra, the same court held:

"Where a vendor brought an action to recover the price of goods sold, and obtained an attachment therein, on the ground that the defendant had removed and disposed of his property with intent to defraud his creditors, which was levied on property of the defendant, but nothing was obtained by plaintiff under the attachment, and said action was subsequently discontinued, by order of the court, on notice to the defendant, held, that plaintiff was not precluded thereby from rescinding the sale, on the ground that it was induced by fraud on the part of the vendee, and from bringing an action to recover the goods sold, in the absence of proof that the vendor brought the first action with knowledge of the fraud."

[2] In the instant case the evidence shows that when the Steel Company filed its liens it was not fully informed as to the facts. It knew the representations made, but did not know their falsity. The company has not tried to enforce such liens. On learning the facts, it gave notice of rescission and claimed the property. If the treasurer of the Construction Company, as was his duty, had informed Mr. Smith of

the facts as to the financial condition of the company, instead of making materially untrue and misleading statements, the Steel Company would have been in position to act intelligently, rescind the sale at that time (April 2d), and stop the steel then in transit, which had not been received and none of which was in the freight house. It was on April 3d or 4th that the larger shipment was unloaded on Vrooman's premises. Of course as to that steel the representations made April 2d by the treasurer materially affect the question of stoppage in transit. Misled by untrue statements, the Steel Company was groping in the dark, and is not now estopped to assert the right of rescission and reclaim the property as between itself and the trustee in bankruptcy. No right of creditors represented by the trustee have intervened. The rights of the trustee to hold the property are precisely the same as the rights of the Construction Company would have been, if bankruptcy proceedings had not been instituted. Thompson v. Fairbanks, 196 U. S. 516, 526, 25 Sup. Ct. 306, 49 L. Ed. 577; Hurley, as trustee, etc., v. Atchison, etc., 213 U. S. 126, 133, 29 Sup. Ct. 466, 53 L. Ed. 729, where the Supreme Court quoted with approval from In re Chase, 124 Fed. 753, 755, 59 C. C. A. 629, 631, as follows:

"It is settled that a trustee in bankruptcy has no equities greater than those of the bankrupt, and that he will be ordered to do full justice, even in some cases where the circumstances would give rise to no legal right, and, perhaps, not even to a right which could be enforced in a court of equity as against an ordinary litigant. Williams' Law of Bankruptcy (7th Ed.) 191. Indeed, bankruptcy proceeds on equitable principles so broad that it will order a repayment when such principles require it, notwithstanding the court or the trustee may have received the fund without such compulsion or protest as is ordinarily required for recovery in the courts either of common law or chancery."

And from Thompson v. Fairbanks, supra, as follows:

"Under the present Bankruptcy Act, the trustee takes the property of the bankrupt, in cases unaffected by fraud, in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt, except in cases where there has been a conveyance or incumbrance of the property which is void as against the trustee by some positive provision of the act."

In the instant case the full carload of steel arrived at Schenectady April 2d, the same day Mr. Smith had his talk with the treasurer of the Construction Company, but it was not unloaded or placed on Vrooman's premises until April 3d or 4th. It was on a siding probably. It may have been near the freight house. Probably the treasurer knew of its arrival, as he said it was there, but Smith did not. In any event this carload of steel had not passed from the possession of the railroad company into that of the Construction Company. There was time and opportunity to stop its delivery, if Smith had been correctly informed as to the financial condition of the company. Smith had learned facts, or a fact, which put him on inquiry, and he made inquiry. He was misinformed by the Construction Company. He was thereby deprived of his opportunity to stop the delivery of the steel to an insolvent concern. Title had not then passed, as delivery had not been made.

[3, 4] As to the other steel, which arrived on the 7th or 9th, the

title never passed to the Construction Company. It did not pay the charges or take it away from the railroad company. It never passed to its possession. The Construction Company was not entitled to the possession thereof until it did pay the charges. See In re N. Y. H. F. G. Co., 169 Fed. 612, 95 C. C. A. 140; In re M. Burke & Co. (D. C.) 140 Fed. 971. As to this steel there was an anticipatory breach of the contract by the Construction Company on the 16th day of April, 1917, which in any event entitled the Steel Company to rescind and take that property. Central Trust Co. v. Chicago Auditorium, 240 U. S. 581, 591, 592, 36 Sup. Ct. 412, 415 (60 L. Ed. 811, L. R. A. 1917B, 580). Says the court:

"Proceedings, whether voluntary or involuntary, resulting in an adjudication of bankruptcy, are the equivalent of an anticipatory breach of an executory agreement."

And when one party to a contract breaches it the other may rescind.

[5] As to the fraudulent representations, the special master was of the opinion that, because the information was given the commercial agencies back in 1915, the Steel Company could not rely on them, but should have made further inquiries. We come, then, to the untrue and fraudulent statements of April 2d, made to Mr. Smith, and are led to inquire what effect these statements had. If the information derived from the commercial agencies did not constitute a fraud, what right did the Steel Company have on April 2d? Was it the right to stop the steel in transit? On what ground did the Steel Company have the right to stop delivery of the steel then on the cars and at Schenectady? On the morning of April 2d the contract of sale was valid and binding, says the special master. There had been no false representations on which the Steel Company could rely to avoid the sale or contract, is the holding. The steel was sold by the Steel Company and purchased by the Construction Company and shipped on a 30 days' credit. This time had not expired. But in fact the Construction Company was insolvent all this time, and was insolvent when the steel was shipped, and at all times thereafter. Of this the Steel Company had no notice or knowledge until just prior to April 2d, when it received some information indicating possible insolvency. Had the Steel Company been correctly informed on the subject, it would have been justified in refusing to ship the steel, except on payment in advance. As the facts were, the Steel Company had a right to stop the steel at any time while in transit, as the Construction Company was in fact insolvent. Willis v. Glenwood Cotton Mills (D. C.) 200 Fed. 301, 305; 35 Cyc. 493, 494, and cases there cited.

The law is correctly stated in Willis v. Glenwood Cotton Mills (D. C.) 200 Fed. 301, 305, 306, thus:

"The seller's lien on a sale of chattels exists at common law without any express agreement, and is impliedly a part of every contract of sale of personal property. It may be defined as the right on the part of the seller to retain possession of the chattels sold until the price is paid. This right continues until delivery of the goods to the purchaser, unless it is divested by any agreement express or implied. It is divested or waived where the sale, although absolute, is on credit to be paid at a fixed future date. Even in this case, however, if the goods have not been actually delivered to the

purchaser, and the purchaser becomes insolvent before payment, the lien or right is revived. It exists or revives, as between seller and purchaser, unless actual or constructive delivery has been made to the purchaser. Although the goods have been delivered to a carrier for transportation, consigned to the purchaser, yet if the purchaser becomes insolvent prior to the delivery to him by the carrier, the right or lien of the seller revives, and can be exercised under the rule of law known as stoppage in transitu; the right of stoppage in transitu being an equitable extension of the principle of the seller's lien for unpaid purchase money.

"Upon a sale of chattels, the seller has the right to retain possession until the purchase price has been paid. If he has parted with the possession, so far as to deliver the chattels to a carrier, consigned to the purchaser, he has still the right to withhold or reacquire possession upon the purchaser's insolvency prior to the carrier's delivery to him. This right is waived by an absolute sale, coupled with an extension of the time of payment for a definite fixed period, but although waived, revives upon the purchaser's insolvency prior to delivery to him, provided the right of innocent bona fide third purchasers may not have intervened."

Says 35 Cyc. 494, 495:

"The right of stoppage in transitu arises only on the buyer's insolvency; but if such insolvency exists, and the whole price has not been paid, the right of stoppage arises, whether the sale is on credit or not. It is immaterial whether the insolvency arose after, or existed at the time of, the sale, provided it was at that time unknown to the seller; but if the insolvency is known to the seller at the time of the sale he cannot exercise the right. Direct proof of insolvency, such as an adjudication of bankruptcy or insolvency, is not essential; but the insolvency may be shown by circumstances, insolvency with respect to stoppage in transitu meaning a general inability to pay, as shown by stoppage of payment, and it has even been held that it is sufficient to show that the buyer is embarrassed and probably not able to pay his debts."

The Steel Company, informed of the attachment levied on the property of the Construction Company, which was in fact insolvent, and thus put on inquiry and seeking to inform itself, to the end that it might assert and exercise its rights and stop the steel in transit, and none of it had then been delivered, went to the treasurer of the Construction Company and sought the facts, but was denied correct information, and instead given false and misleading information, and induced to believe the company solvent, and hence it did not then exercise its right of stoppage in transit and notify the carrier to retain possession.

[6] This steel was in transit until actually delivered and turned over to the Construction Company. Mere arrival at or on the premises of the carrier did not terminate the transportation and right of stoppage in transit. "Transit includes, not only carriage of goods to destination, but delivery there according to the terms of the contract." 35 Cyc. 499, and cases cited. So the seizure of the steel on an attachment by a creditor of the Construction Company did not end transit. 35 Cyc. 500, and cases cited. These materially false representations injured the Steel Company, induced it to forego its rights, and enabled the Construction Company to obtain possession of the carload of steel placed on Vrooman's premises. These representations furnish ample ground for rescission and reclamation of the steel, so far as the bankrupt and its receiver and trustee are concerned.

[7] What right did Vrooman gain by the unloading of the carload

of steel on his premises as against the Steel Company? He does not occupy the position of a purchaser in good faith and for value. He had not made any advances on this steel. It or its value had not been included in any estimate. Vrooman's contract had not been filed as a chattel mortgage. This steel was not in existence when the contract was made between Vrooman and the Construction Company. It was of a peculiar type, and was to be made to fit this particular job.

I discover no ground on which it can be held that Vrooman had or has an equitable lien or claim on this steel, or any of it, as against the Steel Company, induced as it was to part with possession and permit unloading under the circumstances described. The following cases are decisive on this point: Titusville Iron Co. v. City of New York, 207 N. Y. 203, 100 N. E. 806; In re P. J. Sullivan Co., Inc., 254 Fed. 660, —— C. C. A. —— (C. C. A. 2d Circuit), affirming same case (D. C.) 247 Fed. 139. In the Titusville Case the city of New York occupied the same position with reference to the property in question that Vrooman does here. In the Sullivan Case the city of Syracuse occupied the same position Vrooman does here. In both cases the contract between the owner of the premises and the contractor was substantially the same as here.

In the Sullivan Case the city of Syracuse was the owner of the premises on which the building was being erected and on which the contractor had placed the property in question for use in erecting the building. There, as here, such property had not been incorporated in the building. In that case it was the trustee or receiver of the contractor who claimed the property had not passed to the city or owner of the premises. In that case, as here, the contractor had made default in performing his contract, and the city claimed the property, and in fact took it and used it in completing its building after the contractor's default, by consent and direction of the bonding company. There a bonding company for the contractor had entered into the agreement as to the property for its own protection as surety for the contractor, and it was liable to the city for the contractor's default. It was held neither the city nor the bonding company could hold the property as against the trustee in bankruptcy of the contractor. The contractor had not surrendered possession, but such possession was taken by the city by direction of the bonding company, which claimed under its agreement that it could do so in case of the contractor's default.

Here Vrooman's contract was with the contractor, and in case of its default was permitted and authorized by the agreement to take possession of any property placed on the premises by such contractor. Here the trustee in bankruptcy of the contractor claims the property. He is entitled to it as against Vrooman, as is the Steel Company. Here Vrooman claims the steel actually placed on his premises under his agreement with the contractor. The Steel Company is a creditor, and claims such property as against the trustee in bankruptcy because of the frauds committed and the insolvency, and as against Vrooman on the ground he never got title, as he is not a purchaser in good faith for value, and his agreement was not recorded or filed, so as to become effective as a chattel mortgage. There was no present consideration

between Vrooman and the Construction Company, and no present sale, and there was no delivery by the Construction Company to him. Having taken possession of the premises and all property thereon, on the 14th of April, before the actual filing of the petition in bankruptcy, if the question were simply between Vrooman and the Construction Company, and it had no creditors, it may be that Vrooman could hold it. It is not necessary to decide that question. The Construction Company is in bankruptcy and insolvent, and the Steel Company is a creditor, and the trustee claims the steel as against Vrooman, and also against the Steel Company. Vrooman claims it against both. The Steel Company claims it against both the trustee—that is, the Construction Company—and Vrooman, who gains his right, if any, from the Construction Company. All the equities are with the Steel Company, and I think In re Chase, 124 Fed. 753, 59 C. C. A. 629, 631, quoted and approved in Hurley, as trustee, v. Atchison, etc., 213 U. S. 126, 133, 29 Sup. Ct. 466, 53 L. Ed. 729, and hereinbefore cited and quoted, peculiarly applicable to this case. A court of bankruptcy is a court of equity, and may apply and enforce equitable remedies.

I think the conclusions of the special master are correct and that his decision as to title should be confirmed and affirmed, and that the Steel Company should be awarded the steel in question, which means that Vrooman, claimant of the larger shipment, which was placed on his premises, must pay therefor. The case is complex in many of its aspects, and the payment of the fees of the special master, already paid by the Steel Company, will be divided between that company and the bankrupt estate, each paying one-half, and the Steel Company will recover of the trustee one-half thereof, who will pay same as an expense of administration.

There will be a proper decree accordingly.